665 A.2d 223

Michael WHITTLESEY

v.

STATE of Maryland.

No. 16 Sept. Term, 1994.

Court of Appeals of Maryland.

Sept. 28, 1995.

36

Nancy M. Cohen, Assistant Public Defender (Stephen E. Harris, Public Defender; George E. Burns, Jr. (argued) and Margaret L. Lanier, Assistant Public Defenders, all on brief), Baltimore, for appellant.

Tarra DeShields–Minnis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, both on brief), Baltimore, for appellee.

Argued before ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ., and JOHN F. McAULIFFE, J. (Retired, Specially Assigned).

RAKER, Judge.

Appellant Michael Whittlesey was convicted by a jury in the Circuit Court for Caroline County, the Honorable J. Owen Wise presiding, of the first degree murder of James Rowan Griffin. The same jury then sentenced him to death. On this appeal, Whittlesey raises eleven issues for our review. Four of his assignments of error relate to the validity of his conviction:

(1) The State engaged in race discrimination in the use of its peremptory strikes during jury selection, in violation of the Equal Protection Clause of the United States Constitution, as construed in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

(2) Certain statements by appellant were elicited from him in violation of his Sixth Amendment right to counsel and therefore should have been suppressed.

(3) Certain inculpatory statements by appellant should have been ruled inadmissible as uncharged misconduct evidence.

(4) The jury instruction on first degree murder failed to explain adequately the premeditation requirement.

Appellant also presents seven exceptions relating primarily to the penalty phase of his trial. Three of these claims would preclude entirely the imposition of the death penalty in this case:

(1) The Double Jeopardy Clause of the United States Constitution and Maryland's common-law double jeopardy doctrine prohibit the use of the robbery for which appellant was already convicted as the predicate felony

underlying the charge of felony murder or as the aggravator in the sentencing phase.

(2) The Maryland death penalty statute, Maryland Code (1957, 1992 Repl.Vol., 1994 Cum.Supp.) Art. 27, § 413,[1] violates the Eighth Amendment to the United States Constitution in two respects. First, by permitting the use of the same act as a predicate felony for felony murder purposes and as an aggravating circumstance in the sentencing phase, the statute fails to narrow sufficiently the class of murders for which capital punishment is imposed. Second, the allocation of the burden of proof as to mitigating circumstances precludes the sentencer from considering a full range of mitigating factors, and the standard of proof prescribed for the final weighing process inadequately guarantees the reliability of the outcome.

(3) The State violated § 412(b) of Article 27 by serving notice of intent to seek the death penalty on appellant's counsel, rather than directly upon appellant.

Appellant's four other objections would require only a new sentencing hearing, at which the State would be free to seek the death penalty again:

(4) The trial court erred in excluding, on grounds of hearsay, certain mitigating evidence offered by appellant.

(5) The trial court's refusal to propound appellant's requested voir dire questions concerning the attitudes of prospective jurors toward the death penalty impaired appellant's efforts to select an impartial jury, in violation of his rights under the Due Process Clause of the United States Constitution, as construed in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

---

1. Unless otherwise indicated, all statutory cites herein are to Maryland Code (1957, 1992 Repl.Vol., 1994 Cum.Supp.) Art. 27.

(6) Appellant's right to due process was violated when he was required to appear before the sentencing jury in leg shackles.

(7) The trial court erred in permitting the State to introduce a videotape as victim impact evidence.

We find no error in the guilt-or-innocence phase of the trial and affirm the verdict of guilty. We agree with appellant's fourth exception to his sentence, however, and we will therefore vacate the death sentence and remand for a new sentencing proceeding.

### I.

This case arises out of the disappearance of James Rowan Griffin in 1982. Appellant was convicted in 1984 of robbing Griffin. In 1990, Griffin's remains were uncovered in a state park, and appellant was indicted for the first degree murder of Griffin.

On Friday, April 2, 1982, Jamie Griffin, a 17–year–old senior at Dulaney High School in Timonium, Baltimore County, had two conflicting plans for his afternoon and evening. The first plan was to get together with Mike Whittlesey, who had attended school with Griffin before moving to Joppatowne, Harford County, and enrolling in Joppatowne High School. Griffin asked Whittlesey's mother in advance to give Whittlesey permission to leave school early and go to Washington, D.C., with Griffin, to see an elephant festival; she agreed, and the note she wrote excusing her son from school was admitted into evidence in the instant case. On the afternoon of April 2, Griffin and appellant met in the parking lot of a shopping center in Joppatowne, where appellant introduced his girlfriend to Griffin. She asked when they would return from Washington. Griffin responded that they would be back around 6 p.m.; appellant said, "Tell the truth," and Griffin changed his answer to 10 p.m.

Griffin's other plan for April 2 was to go on a retreat in Cecil County with Young Life, a Christian youth group. At school, Griffin sold some tapes to an acquaintance, promising

to deliver them that evening at the retreat. He also called home in the morning and asked his mother to prepare a few items for him to bring on the outing. He planned to run some errands after school and then be home by 4 p.m., so that his father could take him back to the school to meet the Young Life entourage.

When Jamie did not show up on time, his parents searched for him and called the police, who also began looking for him. The Baltimore County Police Department soon identified Michael Whittlesey as the last person known to have seen Griffin alive. They spoke with him on April 3, the day after Griffin was reported missing, and again on April 5 and April 8; at all of these meetings, appellant claimed that he had gone to Washington with Griffin and two other people and gotten separated from Griffin there. Detective Wayne Murphy of Baltimore County also spoke to appellant's father, who said he had received a collect call from appellant, claiming to be in Washington, on April 2; a subsequent examination of phone company records showed that the call actually came from Atlantic City, New Jersey. Based on this clear indication of falsehood, plus various discrepancies in appellant's stories to the police, Detective Murphy applied for a statement of charges accusing appellant of making false statements to a state official, in violation of Art. 27, § 151. Around April 15, a District Court Commissioner in Baltimore County approved the application and issued a warrant for appellant's arrest, which was never served. The police and prosecutors continued to focus their suspicion on appellant, however; he was subpoenaed to appear before the grand jury investigating Griffin's disappearance, and the police put a pen register on his phone to record all of the numbers he called.

Meanwhile, on the night of April 10, eight days after Griffin's disappearance, appellant went out for the evening with David Strathy, a friend from Joppatowne High School. After shooting pool with Strathy well into the morning of April 11, appellant asked Strathy to take him to Gunpowder Falls State Park and help him dig up some gold and silver. Strathy testified that he did not regard the request as suspicious,

because precious metal prices were high at that time and many people, including both appellant and Strathy, were involved in trading second-hand gold and silver. Once they reached a wooded area of the park, however, appellant told Strathy that he really wanted to bury a body, not dig up gold and silver. He led Strathy to a mound and showed him a sneaker under the coverings at one end of the mound. Strathy testified that the position of the sneaker suggested that it had a foot in it. He used his shovel to remove some dirt at the other end of the mound and discovered what appeared to be a red jacket; he poked this item with the shovel and felt something hard, which he believed to be a shoulder.

Convinced that there was in fact a dead body inside the mound, Strathy immediately left the scene, accompanied by Whittlesey. Back in the car, he asked appellant whose body was there; appellant said it was "a little kid with red hair," a description that fit Jamie Griffin. Strathy anonymously reported the incident about one week after it occurred. He later recounted that he saw police activity around the area he had directed them to, but the police evidently found nothing. Meanwhile, the police learned through their pen register on appellant's phone that he was in frequent contact with Strathy. On June 1, entirely independent of Strathy's anonymous report, the police visited Strathy at work, and he again reported the incident involving the body in the woods. At that time, he led them to what he believed was the site he had visited with Whittlesey, but they again turned up nothing.

The police were nevertheless able to take advantage of appellant's confidence in Strathy. They enlisted him to arrange meetings with appellant to try to elicit information about Griffin's disappearance. During those meetings, on June 2 and 4, 1982, the police outfitted Strathy with a body wire, a small device containing a microphone and transmitter which can be easily concealed. Through this procedure, the police were able to record several conversations between Strathy and appellant ("the Strathy conversations"), containing numerous incriminating statements by appellant, including a detailed description of how appellant buried Griffin's body.

On June 6, two days after the second Strathy conversation, the police executed a search warrant at the home of Whittlesey's mother, which was appellant's primary residence at the time. Appellant was present when the police searched his bedroom. That search turned up audio cassettes and a cassette player matching the description of items belonging to Griffin.

Although they had evidence indicating that Whittlesey had killed Griffin, the prosecutors in Baltimore County still did not have his body, a fact which they believed would have hindered any prosecution for murder. They had, however, discovered Griffin's belongings in appellant's possession. They had also found Griffin's car in Atlantic City; as noted above, phone records indicated that Whittlesey called his father from Atlantic City on the day Griffin disappeared. On July 6, 1982, the grand jury for Baltimore County returned an indictment against appellant for robbery, assault with intent to rob, and three counts of statutory theft (for Griffin's car, his cassettes, and his cassette player), in violation of § 342 of Article 27. In 1984, appellant was tried before a jury in Baltimore County, convicted on all counts, and sentenced to 25 years imprisonment (10 years on the robbery and 15 years for theft of the auto, to run consecutively; the remaining offenses merged). The Court of Special Appeals affirmed in an unreported opinion. *Whittlesey v. State*, No. 764, Sept. Term, 1984, 61 Md.App. 721, unreported (Md.Ct.Spec.App. Jan. 30, 1985), *cert. denied*, 303 Md. 297, 493 A.2d 350 (1985). Whittlesey has been incarcerated since he was arrested on the robbery indictment in June 1983.

After Jamie Griffin's disappearance, his parents never relented in their search for their only child, until, in 1990, they finally found him. *See Whittlesey v. State*, 326 Md. 502, 514–19, 606 A.2d 225, 230–33 (1992) (*"Whittlesey I "*) (detailing the search for Griffin by his parents and the police), *cert. denied*, —— U.S. ——, 113 S.Ct. 269, 121 L.Ed.2d 198 (1992). With the assistance of an advanced radar system, the Griffins and the police located Jamie Griffin's remains at Gunpowder Falls State Park on March 24, 1990. One month later, appel-

lant was indicted for murder in the first degree. *See* Art. 27, §§ 407, 410.[2] He was subsequently served with notice of the State's intent to seek the death penalty. *See* Art. 27, § 412(b).

After the case was removed to Caroline County on appellant's suggestion, appellant moved to dismiss the prosecution as a violation of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. The trial court denied the motion. Whittlesey took an immediate appeal to the Court of Special Appeals, *see Neal v. State*, 272 Md. 323, 322 A.2d 887 (1974), and we caused a writ of certiorari to issue to that court before consideration of the case.

We affirmed the trial court's denial of appellant's motion to dismiss. *Whittlesey I*, 326 Md. at 535, 606 A.2d at 241. We agreed with appellant that the murder indictment of 1990 involved the same conduct as the robbery and theft indictment of 1982, and we assumed that this factual overlap barred the second prosecution (absent some exception) under the interpretation of the Double Jeopardy Clause prevailing at the time. *See Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990) (holding that the Double Jeopardy Clause prohibits successive prosecutions based on the same conduct), *overruled by United States v. Dixon*, —— U.S. ——, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). We also noted that, absent some exception, the prosecution on a felony murder theory would be barred by the more traditional double jeopardy principles enunciated in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *Whittlesey I*, 326 Md. at 526, 606 A.2d at 237.

We held, however, that the exception enunciated in *Diaz v. United States*, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912), would apply to a prosecution of first degree murder on a theory of "wilful, deliberate and premeditated killing," *see* Art.

---

**2.** Section 407 defines "wilful, deliberate and premeditated" murder as first degree murder. Section 410 designates as first degree murder "[a]ll murder which shall be committed in the perpetration of, or attempt to perpetrate, any ... robbery."

27, § 407, or felony murder. That exception, as we explained it in *Whittlesey I,* permits a subsequent prosecution on a greater charge after conviction on a lesser charge where "a reasonable prosecutor, having full knowledge of the facts which were known and in the exercise of due diligence should have been known to the police and the prosecutor at the time, would not be satisfied that he or she would be able to establish the suspect's guilt beyond a reasonable doubt." *Whittlesey I,* 326 Md. at 527, 606 A.2d at 237.

After our decision in *Whittlesey I,* appellant was tried before a jury in Caroline County and found guilty of both premeditated murder and felony murder. The same jury then proceeded to determine his punishment. *See* Art. 27, § 413(b)(1). The State moved all of its testimonial evidence and exhibits from the guilt-or-innocence phase into evidence for sentencing purposes. This evidence was offered to establish that Whittlesey was the principal in the first degree in Griffin's murder, *see* Art. 27, § 413(e)(1), and to prove, as the sole aggravating factor, that the murder was committed in the course of a robbery, *see* Art. 27, § 413(d)(10). The jury found these facts to be established beyond a reasonable doubt. The State also presented victim impact testimony from Jamie Griffin's parents and a videotape of Griffin playing the piano, a skill for which he had been nationally recognized.

In terms of mitigation, *see* Art. 27, § 413(g), the State and appellant stipulated that appellant had not previously been convicted of a crime of violence. Although appellant had been convicted of the robbery of Jamie Griffin, the State agreed to the stipulation because the prior conviction arose from the same incident as the one involved in this case. The defense also produced testimony that Whittlesey was young at the time the crime was committed; that the murder was committed during a quarrel between Whittlesey and Griffin; that Whittlesey's prison record contained only a few minor rule infractions; that safeguards exist in the parole system to assure that Whittlesey would stay in prison if sentenced to life; and that he came from a dysfunctional family.

Whittlesey did not testify, but he did exercise his right of allocution. *See* Maryland Rule 4–343(d). In his remarks to the jury, he emphasized four points: that he was young at the time of the killing; that his prison record was good; that he was unlikely to pose a threat to society in the future; and that, on the day Griffin died, he (Whittlesey) had taken lysergic acid diethylamide (LSD) for the only time in his life. The jury unanimously found that Whittlesey was of youthful age at the time of the crime and that he came from a dysfunctional family; one or more jurors also believed that appellant did not pose "a continuing threat to society" and that he had a gambling problem.

The jury unanimously concluded that the aggravators outweighed the mitigators and that appellant should therefore be sentenced to death. *See* Art. 27, § 413(h).

## II.

We begin by addressing Whittlesey's four objections to his conviction.

### A. *Race Discrimination in Jury Selection*

■ Appellant asserts that the State exercised a peremptory challenge to strike an African–American venirewoman because of her race, in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.[3] The trial court found that the appellant failed to make out the necessary *prima facie* case of discrimination under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). We find no error.

■ When a criminal defendant raises a *Batson* claim, the trial judge must follow a three-step process. The burden is initially upon the defendant to make a *prima facie* showing of purposeful discrimination. *Stanley v. State*, 313 Md. 50, 59, 542 A.2d 1267, 1271 (1988). If the requisite showing has been

---

3. "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

made, " 'the burden shifts to the State to come forward with a neutral explanation for challenging black jurors.' " *Id.* at 61, 542 A.2d at 1272 (quoting *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723); *Tolbert v. State*, 315 Md. 13, 18, 553 A.2d 228, 230 (1989); *see also Mejia v. State*, 328 Md. 522, 531 n. 6, 616 A.2d 356, 360 n. 6 (1992) (updating the *Batson* test in light of subsequent decisions). "Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination." *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion of Kennedy, J.); *see also Stanley*, 313 Md. at 62, 542 A.2d at 1273.

■ The disputed strike in this case involved prospective juror Gwendolyn Wright. After completion of voir dire and excuses for cause, six African–Americans remained among the fifty-five members of the venire. The State exercised its second and fourth peremptory challenges to exclude African–American women from the jury. Appellant objected on *Batson* grounds after the State challenged Ms. Wright with its fourth strike.[4] Appellant draws an inference of discrimination from the two strikes taken together, but only the exclusion of Ms. Wright is challenged on this appeal.

■ After the defense objected, counsel clarified for the court that, although both of the disputed strikes involved women, the *Batson* objection was limited to race, not gender.[5] Defense counsel then asserted that the circumstances raised a *prima facie* case of race discrimination. The trial judge replied:

---

4. Although appellant is white, he has the right to challenge the exclusion of African–Americans from the jury. *See Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

5. Appellant's brief suggests that the court erred by not finding a *prima facie* case of discrimination based on either race or sex. It is clear from the trial record, however, that the objection was based on racial grounds alone; therefore, we will not consider the gender claim.

> Well I don't find any racial issue that the State has to explain at all, but if you want, under *Batson* or something, theory of law that hasn't been decided yet.

It appears from this response that the court had concluded that no *prima facie* case had been made, but nevertheless invited the State to provide race neutral reasons for its strikes. The State then explained that it had struck the first black venirewoman because of her apparent reluctance to serve on a jury in a capital case and Ms. Wright because of "her employment." Defense counsel requested that the State be more specific and that the court inquire as to whether any other members of the venire had the same occupation as Ms. Wright. The court made no further inquiry and overruled appellant's *Batson* objection.

We review the trial court's finding that the party contesting the strikes has failed to establish a *prima facie* case on a clear error standard. *See Stanley*, 313 Md. at 84, 542 A.2d at 1283. Although it would have been preferable for the trial judge to state the reasons for his ruling expressly, we presume that the trial judge properly applied the law. *Beales v. State*, 329 Md. 263, 273, 619 A.2d 105, 110 (1993). Furthermore, upon our own examination of the record, we do not think the trial court's conclusion was clearly erroneous.

Having found no clear error in the finding that appellant had not established a *prima facie* case, we affirm the court's rulings in response to appellant's *Batson* objection.

### B. *Sixth Amendment Exclusionary Rule*

Appellant next excepts to the denial of his motion to exclude the Strathy conversations from evidence on Sixth Amendment grounds.[6] As described above, the Strathy conversations were recorded after Detective Wayne Murphy of the Baltimore County police had applied for a statement of charges against appellant for allegedly making false statements to the police.

---

6. "In all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defence." U.S. Const. amend. VI.

With this application, he obtained a warrant for appellant's arrest; this warrant was never served. The charge thus remained outstanding at the time the Strathy conversations occurred.

Under the Sixth Amendment to the United States Constitution, a statement by the defendant is not admissible in a criminal trial, absent a proper waiver, if it was made (1) out of the presence of counsel, (2) in response to interrogation by an agent of the State, and (3) after the right to counsel had attached with respect to the charge being tried. *See Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). In this Court, it is undisputed that the first two requirements are satisfied in this case.

With respect to the third requirement, Whittlesey offers two rationales for finding that his right to counsel had attached. First, he suggests that the right attached simply by virtue of the investigators' focus on him as their prime suspect. Focus, however, is not the trigger for the attachment of the right to counsel. " '[A] person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him.' " *United States v. Gouveia,* 467 U.S. 180, 187, 104 S.Ct. 2292, 2296, 81 L.Ed.2d 146 (1984) (quoting *Kirby,* 406 U.S. at 688, 92 S.Ct. at 1881). Adversary proceedings are commenced by a "formal charge, preliminary hearing, indictment, information or arraignment." *Lodowski v. State,* 302 Md. 691, 716, 490 A.2d 1228, 1240 (1985), *vacated for further consideration,* 475 U.S. 1078, 106 S.Ct. 1452, 89 L.Ed.2d 711, *holding reinstated in relevant part,* 307 Md. 233, 242–43, 513 A.2d 299, 304–05, *cert. denied,* 475 U.S. 1086, 106 S.Ct. 1469, 89 L.Ed.2d 725 (1986). Thus, the mere fact that the State has focused on one individual will not trigger the accused's right to counsel.

■ Whittlesey's second argument for finding that the right to counsel had attached requires us to accept two premises: First, that Detective Murphy's filing of the statement of charges caused appellant's Sixth Amendment right to attach with respect to the false statements charge.[7] Second, that the attachment of the right to counsel on the false statements charge caused this right to attach with respect to the murder charge as well. Because we reject the second premise, we find no error in the admission of appellant's statements.

The United States Supreme Court has frequently reiterated that "the Sixth Amendment right [to counsel] . . . is offense-specific." *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991); *accord Moran v. Burbine,* 475 U.S. 412, 431, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986). Under this principle, the Sixth Amendment would not bar the admission at Whittlesey's murder trial of statements made before he was charged with murder, even if the statements were made after the right to counsel had attached with respect to the false statements charge.

Two Supreme Court cases, however, arguably establish an exception to this rule. The first case is *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), which involved the disappearance of a young girl. After Williams was formally charged with abduction, the police elicited from him the location of the girl's body. He was then charged with murder. The Supreme Court held that Williams's statements were inadmissible in his murder trial, without mentioning the principle of "offense specificity."

The other case is *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), in which Moulton and a co-defendant committed a burglary, but were originally indicted

---

**7.** Because we dispose of this issue on other grounds, we will not reach the question of whether the filing of a statement of charges alleging an offense within the exclusive jurisdiction of the District Court will cause the Sixth Amendment right to attach prior to service of the warrant. For a case finding that the right to counsel had attached in these circumstances, see *State v. Nelsen,* 390 N.W.2d 589 (Iowa 1986).

only for theft. After this indictment was returned, the co-defendant agreed to cooperate with the police and to attempt to elicit incriminating statements from Moulton. The effort was successful, and the incriminating statements Moulton made to his co-defendant led to the addition of burglary and other charges against Moulton. Moulton was convicted, but the Supreme Judicial Court of Maine reversed, finding a violation of Moulton's Sixth Amendment right to counsel. The United States Supreme Court affirmed this decision. 474 U.S. at 168, 106 S.Ct. at 483. Notably, the Court reversed both the theft and the burglary convictions, notwithstanding that Moulton had not been charged with burglary when the statements were elicited. *Id.* at 180, 106 S.Ct. at 489.

In light of *Brewer* and *Moulton,* several jurisdictions have recognized that the right to counsel applies to some offenses that have not yet been charged. *See, e.g., United States v. Kidd,* 12 F.3d 30, 32 (4th Cir.1993) (recognizing but not applying the exception); *Hendricks v. Vasquez,* 974 F.2d 1099 (9th Cir.1992) (recognizing but not applying the exception); *United States v. Carpenter,* 963 F.2d 736 (5th Cir.1992) (recognizing but not applying the exception); *United States v. Hines,* 963 F.2d 255, 257–58 (9th Cir.1992) (recognizing but not applying the exception); *United States v. Cooper,* 949 F.2d 737, 743–44 (5th Cir.1991) (recognizing but not applying the exception); *United States v. Mitcheltree,* 940 F.2d 1329 (10th Cir.1991) (applying the exception); *People v. Clankie,* 124 Ill.2d 456, 125 Ill.Dec. 290, 530 N.E.2d 448 (1988) (applying the exception); *State v. Tucker,* 137 N.J. 259, 645 A.2d 111 (1994) (recognizing but not applying the exception), *cert. denied,* —— U.S. ——, 115 S.Ct. 751, 130 L.Ed.2d 651 (1995); *see also United States v. Louis,* 679 F.Supp. 705 (W.D.Mich.1988) (finding that the right to counsel attached to uncharged offenses, without relying on *Brewer* and *Moulton* to support this proposition); *In re Pack,* 420 Pa.Super. 347, 616 A.2d 1006 (1992) (applying exception), *allocatur denied,* 535 Pa. 669, 634 A.2d 1117 (1993); *Upton v. State,* 853 S.W.2d 548 (Tex.Crim. App.1993) (holding, without citation to *Brewer* or *Moulton,* that the defendant's statements concerning a robbery were

inadmissible where they were made after the defendant had been arraigned for the underlying theft); *but see People v. Clair*, 2 Cal.4th 629, 7 Cal.Rptr.2d 564, 581, 828 P.2d 705, 722 (holding that, in light of subsequent Supreme Court pronouncements, *Brewer* and a line of California cases deviating from offense specificity are "no longer vital"), *cert. denied*, —— U.S. ——, 113 S.Ct. 1006, 122 L.Ed.2d 155 (1993). Specifically, these courts have recognized that, once the right to counsel attaches with respect to a charged offense, it may carry over to "closely related" but uncharged crimes.

This is a question of first impression for this Court. At the outset, we question whether this doctrine of carry-over is in fact compelled by Supreme Court precedent.[8] We need not resolve this question, however. Instead, we shall follow a similar approach to that taken by the Court of Special Appeals in *Bruno v. State*, 93 Md.App. 501, 613 A.2d 440 (1992), *aff'd*, 332 Md. 673, 632 A.2d 1192 (1993), the only reported Maryland decision addressing this issue. In *Bruno*, after the defendant was charged with rape, he discussed with various people, including a government informant and an undercover police officer, the possibility of having the rape victim killed to

---

8. The holdings in *Brewer* and *Moulton*, upon close inspection, do not appear to stray so far from offense specificity as appellant and some courts have suggested. In *Brewer*, the Supreme Court of Iowa had found that Williams's right to counsel had attached on the murder charge, but that he had waived the right. *Brewer*, 430 U.S. at 394, 97 S.Ct. at 1237. As for *Moulton*, the Supreme Court in that case affirmed the judgment of the Supreme Judicial Court of Maine, which reversed Moulton's convictions, on the apparent assumption that Moulton's right to counsel had attached with respect to the burglary charges. These determinations are significant because the procedure for commencement of criminal proceedings, which in turn triggers the attachment of the right to counsel, is generally prescribed by state law. *See Moore v. Illinois*, 434 U.S. 220, 228, 98 S.Ct. 458, 464, 54 L.Ed.2d 424 (1977); *State v. Johnson*, 318 N.W.2d 417, 432 (Iowa), *cert. denied*, 459 U.S. 848, 103 S.Ct. 106, 74 L.Ed.2d 95 (1982). Thus, the Supreme Court did not reexamine the state findings on this issue.

Furthermore, in *Brewer*, the interrogation violated an express agreement between the police and Williams's counsel; the Supreme Court's conclusion may have been based on this apparent misconduct, in addition to Sixth Amendment considerations. *Cf. Mitcheltree*, 940 F.2d at 1343 (finding carry-over because of misconduct by investigators).

prevent her from testifying against him. The defendant was subsequently indicted for solicitation to commit murder and obstruction of justice.

The Court of Special Appeals, speaking through Chief Judge Wilner, did not decide whether the right to counsel will ever carry over from a charged offense to an uncharged but closely related offense. Instead, the court found no carry-over in the case before it, concluding that the "new charges filed against appellant were not at all closely related to those for which he was already under indictment." *Id.* at 514, 613 A.2d at 447. Like the Court of Special Appeals, we will not decide whether the Sixth Amendment ever requires carry-over from one offense to another, but instead will focus on whether the offenses involved in this case are closely related to each other. If they are not, then there was no Sixth Amendment violation.

To determine whether the false statements charge was closely related to the instant murder charge, we now examine the decisions of the courts that have applied the doctrine of carry-over. Whittlesey has urged upon us the test espoused by *People v. Clankie,* 124 Ill.2d 456, 125 Ill.Dec. 290, 530 N.E.2d 448 (1988). In that case, after the defendant was formally charged with burglary, he told a police informant that the indictment against him contained the wrong date for the crime. The prosecution responded by filing an information alleging burglary and stating the correct date; trial on this information was joined with the trial on the original indictment, and Clankie was found guilty of the burglary count containing the correct date. At trial, Clankie's statements to the informant were admitted against him; he was acquitted on the former count of burglary and convicted on the latter. The Supreme Court of Illinois reversed Clankie's conviction, interpreting *Brewer* and *Moulton* to apply the Sixth Amendment exclusionary rule to all offenses "closely related" to an offense already charged. *Clankie,* 125 Ill.Dec. at 294, 530 N.E.2d at 452.

The courts of Illinois have given the term "closely related" a narrow interpretation, sometimes relying on the phrase "*ex-*

*tremely* closely related," which also appears in *Clankie. Id.*; *see People v. Spivey*, 245 Ill.App.3d 1018, 186 Ill.Dec. 48, 51, 615 N.E.2d 852, 855 (1993) (two similar sets of criminal acts, occurring in the same location but at different times and involving different victims, were not "extremely closely related"); *People v. Dotson*, 214 Ill.App.3d 637, 158 Ill.Dec. 349, 355, 574 N.E.2d 143, 149 (where detective investigating a shooting murder arrested defendant on a firearms charge, the two offenses were not "closely related"), *appeal denied*, 141 Ill.2d 549, 162 Ill.Dec. 497, 580 N.E.2d 123 (1991).

Among the other courts that have addressed this issue, two lines of decisions have emerged. In one line, the courts have invoked Sixth Amendment carry-over for deterrent purposes where (1) the offenses are "closely related," construing that phrase relatively broadly, and (2) there is evidence of deliberate police misconduct. *See, e.g., United States v. Martinez*, 972 F.2d 1100 (9th Cir.1992) (remanding for a determination of whether state prosecutors deliberately dropped charges against defendant to facilitate a federal investigation of the same conduct); *United States v. Mitcheltree*, 940 F.2d 1329 (10th Cir.1991) (reversing conviction for witness tampering where the defendant (Mitcheltree) was indicted for a drug offense, and then she contacted a potential government witness (Rizzo) in the drug case, and the government exploited that contact to acquire evidence for the drug prosecution and for a witness tampering prosecution that arose from the contact between Mitcheltree and Rizzo); *United States v. Olsen*, 840 F.Supp. 842 (D.Utah 1993) (concluding that there was no misconduct, and that the disputed statements were therefore admissible in a federal prosecution, where federal agents had elicited statements from the defendant after the right to counsel had attached with respect to a state charge arising from the same incident). We do not have allegations of misconduct here; thus, the instant case is not within this line of decisions.

Instead, we will consider whether this case falls within the second line of cases deriving from *Clankie* and analogous decisions in other jurisdictions. These cases focus entirely on

whether the facts underlying charged and uncharged offenses are "closely related," *Clankie,* 125 Ill.Dec. at 292, 530 N.E.2d at 451, "inextricably intertwined," *United States v. Cooper,* 949 F.2d 737, 743 (5th Cir.1991), *cert. denied,* 504 U.S. 975, 112 S.Ct. 2945, 119 L.Ed.2d 569 (1992), or "inextricably enmeshed," *In re Michael B.,* 125 Cal.App.3d 790, 178 Cal.Rptr. 291, 295 (1981).

The unifying theme among the Sixth Amendment cases has been that the right to counsel carries over only to new charges arising from "the same acts on which the [pending] charges were based." *United States v. Louis,* 679 F.Supp. 705, 709 (W.D.Mich.1988). To determine whether the same acts underlie both charges, courts have looked for identity of time, place, and conduct. *United States v. Kidd,* 12 F.3d 30, 33 (4th Cir.1993); *United States v. Hines,* 963 F.2d 255, 257 (9th Cir.1992); *Hendricks v. Vasquez,* 974 F.2d 1099, 1104–05 (9th Cir.1992); *United States v. Carpenter,* 963 F.2d 736, 741 (5th Cir.1992); *Bruno v. State,* 93 Md.App. 501, 514, 613 A.2d 440, 447 (1992), *aff'd,* 332 Md. 673, 632 A.2d 1192 (1993); *Upton v. State,* 853 S.W.2d 548, 555–56 (Tex.Crim.App.1993). Some have also required identity of prosecuting sovereign. *See, e.g., United States v. Williams,* 993 F.2d 451, 457 (5th Cir.1993); *United States v. Nocella,* 849 F.2d 33, 37–38 (1st Cir.1988); *United States v. Olsen,* 840 F.Supp. 842, 849 (D.Utah 1993); *but see Louis,* 679 F.Supp. at 709. Another test employed by at least one court is whether the statements elicited by the police constituted evidence of both offenses. *See In re Pack,* 420 Pa.Super. 347, 616 A.2d 1006 (1992).

In measuring the scope of Sixth Amendment carry-over, we think two cases are particularly on point. The first, *United States v. Williams,* 993 F.2d 451 (5th Cir.1993), involved a defendant accused by the State of Arkansas of illegal delivery of controlled substances. After she had been formally charged with the drug offenses, she was called before a federal grand jury investigating a local drug organization. Based on her testimony in that investigation, she was charged with making false declarations before a grand jury. The Fifth Circuit held that the state crime and the subsequent prevari-

cation about it were not "extremely closely related." *Id.* at 457. Consequently, the right to counsel had not attached with respect to the false declarations charge.

We also find *Hendricks v. Vasquez,* 974 F.2d 1099 (9th Cir.1992), instructive. That case involved a series of murders committed in the summer of 1980 in Los Angeles, Oakland, and San Francisco. In the spring of 1981, Hendricks was arrested by federal authorities in Dallas and arraigned on a charge of interstate flight from homicide charges. He was then questioned about the murders in San Francisco, for which he had not yet been charged. The Ninth Circuit stated,

> Although not wholly unrelated, the two crimes [murder and interstate flight from murder charges] have totally independent elements. The murders were separate incidents from the flight; they were neither "inextricably intertwined" with the flight nor did they arise from the same conduct.

*Id.* at 1104–05. The court held that Hendricks's right to counsel had not attached with respect to the murder charges.

Turning now to the case before us, we conclude that the false statements charge and the murder charge are not "closely related" offenses. The false statements occurred days after the murder, in another location. The conduct was also distinct; as *Williams* and *Hendricks* establish, committing a crime is separate from an attempt to avoid responsibility for it.

As for the same evidence test, we reach the same result. Because Whittlesey, in his statements to the police, denied harming Jamie Griffin, any admission to murder would have provided support for the false statements allegations, as well as the murder charge. On the other hand, the false statements charge could have been supported by evidence that appellant told the police inconsistent stories in his two meetings with them, without regard to which story was true. Furthermore, the State could disprove many of appellant's statements to the police, such as his claim to have gone to Washington with Griffin, without having to show that appel-

lant had killed Griffin. Thus, the proof for the two crimes does not necessarily require identical evidence.

We therefore find that the Sixth Amendment right to counsel, even if it had attached for the false statements offense, had not attached for the murder charge. Thus, with respect to the instant charge, Whittlesey was not immunized from questioning in the absence of counsel, and the Strathy conversations were properly admitted into evidence.

## C. *Uncharged Misconduct Evidence*

Appellant contends that the trial court erroneously admitted certain evidence that appellant characterizes as other crimes evidence. The court admitted this evidence on the ground that it did not constitute uncharged misconduct evidence.[9]

The first occasion happened during testimony by appellant's friend Shawn Potochney. Potochney testified for the State that Whittlesey had recounted that he had carried a knife while he was in the District of Columbia with Griffin, and that the police had confiscated it from him after a woman walking ahead of him reported that he was following her. The second occasion was when the prosecution introduced portions of the Strathy conversations that included Whittlesey's comments that, in order "to get out of here" to avoid prosecution, he could commit various crimes, including robbery.

### *Appellant's Knife.*

The defense first objected to what it called other crimes evidence when appellant's friend Shawn Potochney testified that, the day after Griffin's death, appellant spun an elaborate tale about a visit to Washington, D.C., with Griffin the previous day. At one point, Potochney testified, Whittlesey claimed to have had trouble with the police during his outing:

---

9. For purposes of this opinion, we will use the phrases "other crimes evidence" and "bad acts evidence" interchangeably, along with the umbrella term "uncharged misconduct evidence."

> Mike just told his father and me sitting there, I guess, that when he was on his trip in Washington, he was complaining that the police confiscated this knife he carried. . . .

The defense objected on the basis that the testimony related to "other crimes." The State argued that carrying a knife is not necessarily a crime, or even a bad act. The trial judge's response is transcribed as "unintelligible," but he appears to have agreed with the State, as he overruled appellant's objection. After this ruling, Potochney resumed as follows:

> [T]he story [Whittlesey] told us was that when he was down in Washington, that there was some black woman walking in front of them . . . and that she got scared . . . and thought Mike was following her, so she called the police . . . and then they took his knife off of him. . . .

Appellant again objected to the references to the knife.

There was no objection concerning the woman who called the police. Any objection to the admission of details about the woman is therefore not preserved for our review. We think the references to the knife and to the woman who was frightened by Whittlesey were intertwined, however, and that the story should thus be treated as a whole.

■ Before this Court, the State reiterates that Potochney's testimony about the knife did not constitute evidence of other crimes, because mere possession of a knife is not a crime under the laws of Maryland or the District of Columbia. Moreover, the State notes that walking behind a woman is not a crime, either. Appellant responds that, under the circumstances of this case, these acts could be construed as misconduct. We agree, and we therefore treat Potochney's story as bad acts evidence. *See generally* E. Imwinkelried, *Uncharged Misconduct Evidence* § 2:14 (1994) (observing that acts that may reflect negatively on the defendant's character implicate the policies underlying the rule against other crimes evidence).

■ This Court has adopted a general rule of exclusion with respect to bad acts evidence. *Harris v. State*, 324 Md. 490, 494–95, 597 A.2d 956, 959 (1991). Procedurally, this rule

entails a three-step process for the admission of such evidence. First, the trial court must find that the evidence "is relevant to the offense charged on some basis other than mere propensity to commit crime." *Id.* at 496, 597 A.2d at 960; *see also State v. Faulkner,* 314 Md. 630, 634, 552 A.2d 896, 897–98 (1989). Second, the court must find by clear and convincing evidence that the defendant participated in the alleged acts. *Harris,* 324 Md. at 498, 597 A.2d at 960; *Faulkner,* 314 Md. at 634, 552 A.2d at 898. Third, the court must determine that the probative value of the evidence substantially outweighs its potential for unfair prejudice. *Harris,* 324 Md. at 500–01, 597 A.2d at 962; *see also Faulkner,* 314 Md. at 635, 552 A.2d at 898.

If we were to apply this test, Whittlesey's declarations concerning the knife would be inadmissible. The evidence fails the second prong of the test; far from being supported by clear and convincing evidence, Whittlesey's statements were thoroughly discredited by the State's evidence that he never even went to Washington the evening Griffin disappeared. Moreover, the State did not introduce the evidence for the truth of Whittlesey's inculpatory statement and could never prove that the appellant was involved in the "other crime."

We are thus faced with three choices: we can apply the *Harris–Faulkner* test and hold the evidence inadmissible because it fails the clear-and-convincing requirement; we can find that this is not uncharged misconduct evidence and hold that the *Harris–Faulkner* test is inapplicable; or we can find that this is uncharged misconduct evidence, and that it is within the general rule of exclusion, but hold that it is subject to some exception permitting its admission. As we now explain, we adopt the third approach and consequently find that Potochney's testimony was not inadmissible as uncharged misconduct evidence.

In *United States v. Byrd,* 771 F.2d 215 (7th Cir.1985), the Seventh Circuit adopted the third approach and created an exception to the general rule concerning the admission of

other crimes for cases where the probative value of the evidence does not depend on whether the prior bad act ever actually occurred. In *Byrd*, the government alleged that Jesse Byrd and Sara Carlton had used forged withdrawal slips to withdraw money from a bank account. At Byrd's trial, Carlton testified that Byrd had told her he needed the money " 'to cover some money that was taken [from his employer] that he said he had got robbed, but really didn't.' " *Id.* at 220. The defense objected that this appeared to be evidence of embezzlement by Byrd.

Applying a three-prong test essentially the same as the *Harris–Faulkner* test, the Seventh Circuit found that the embezzlement had not been established by clear and convincing evidence.[10] Rather than exclude the evidence, however, the court created an exception providing that evidence of prior bad acts may be admitted without satisfying the clear-and-convincing threshold if the "probative value [of the proffered evidence] ... does not depend on whether the misconduct it reports actually took place." *Id.* at 223. The court offered a hypothetical example:

> [S]uppose that a bank teller testifies that the defendant, in committing a robbery, pointed to a bulge in his coat pocket and said, "I've killed three people with this, and I'll kill you, too." The testimony is probative of the fact that the robber was armed. But its probative value does not depend on the truth of the robber's statement that he has killed three people. The testimony is not offered to prove that the robber killed three people in the past, in order to prove from that uncharged misconduct some fact material to the crime for which he is now on trial. Consequently, no purpose is served by barring the admission of the testimony

---

10. In the Seventh Circuit, evidence of uncharged misconduct is admissible only if it meets the following requirements: (1) it fits within an exception recognized by Rule 404(b) of the Federal Rules of Evidence, (2) its probative value outweighs its prejudicial effects, and (3) the misconduct is proved by clear and convincing evidence.
*Byrd*, 771 F.2d at 220 (citation omitted).

unless the three previous killings are proved by clear and convincing evidence. It does not matter whether the killings took place or not.

*Id.* at 221. In *Byrd,* the court found that while Byrd's statement suggested that he had embezzled money, it was relevant to his motive to steal even if the embezzlement never occurred, so long as Byrd believed that he might be held responsible for the missing money.

The exception created by the *Byrd* court is, however, a limited exception to the general rule relating to the admissibility of uncharged misconduct. The court stressed that, notwithstanding the inapplicability of the clear-and-convincing requirement to this type of evidence, the testimony must nonetheless comply with the other two parts of the three-prong test. Upon determining that the evidence before it satisfied these requirements, the court held that the evidence had been properly admitted. *Id.* at 223.

We agree with the *Byrd* court that statements that indicate that the defendant has participated in "bad acts" but that are not offered for that purpose require special treatment. The evidence may have substantial probative value, but, if subjected to the clear-and-convincing requirement, it would be excluded "for a reason that has no application in the circumstances." *Id.* at 222. Thus, where the probative value of the evidence does not depend upon proof that the misconduct actually took place, the court should not apply the clear-and-convincing requirement in assessing the admissibility of the testimony. Before admitting the evidence, however, the trial court still must decide whether the testimony is admissible for some purpose other than to prove bad character, propensity, or the like, and whether the probative value substantially outweighs the risk of unfair prejudice.

In this case, we find that the disputed testimony was admissible. The evidence was not offered to prove that Whittlesey actually went to Washington with a knife. Instead, the State offered Potochney's testimony to show that appellant felt the need to tell a false story, indicating consciousness of

guilt. The particular details concerning the knife and its confiscation were relevant in the nature of an "alibi" for the murder weapon; the jury could infer that appellant fabricated this tale about his missing knife to preempt suspicion that he had stabbed Griffin and then left the knife at the scene of the killing or disposed of it somewhere else. In this respect, appellant's statements were relevant to the issue of criminal agency.

We hold that the trial court properly admitted this evidence. This evidence had substantial probative value, in that it highlighted appellant's fear of prosecution. By contrast, the risk of unfair prejudice was slight, because the State established that Whittlesey's story was false; thus, any inference that the jury might have drawn from the fact that Whittlesey took a knife with him to Washington was likely to have been eliminated by the evidence that appellant never even went to Washington.

*Appellant's Plans for Escaping Prosecution.*

Prior to trial, the appellant requested that the trial court redact "any and all references to Defendant's involvement in 'other crimes' or 'bad acts' " from the tapes of the Strathy conversations.

In certain portions of these tapes, appellant and Strathy discussed plans to flee Maryland to avoid charges relating to Griffin's death. (While Strathy was cooperating with the police, he had been telling appellant that he (Strathy) could get in trouble for having gone with appellant to see Griffin's body and then not reporting it to the police.) Throughout these discussions, appellant noted illicit ways he might be able to support himself as a fugitive. In one example, he speculated,

I might take a bus ticket to, uh, to Delaware, take a bus ticket to Delaware! Then take a bus from Delaware to New Jersey. Get inside that car. The car's unlocked and the key's hidden by the seat. Get inside the car.

Nah, they might have that under surveillance; it's been there too long. Yeah, so fuck that car. I just, I just knock somebody over the head with one of those things with chains, you know, I'm pretty good with that, knock somebody over the head, take their car. In some parking lot. It's the only thing I can do.

Before the tapes were played for the jury, the defense requested the exclusion of these statements relating to criminal activity during flight.

The trial court, concluding that this evidence reflected appellant's consciousness of guilt regardless of whether he actually committed the crimes described in the tapes, declined to apply the rule against bad acts evidence to these statements; the court reasoned that they were admissible because they were merely speculative. The trial judge did exclude, on grounds of undue prejudice, a comment in which appellant expressed the determination to spring his brother from prison in Florida.

██ The appellant argues that none of these statements were relevant to any issue at trial, that they were not established by clear and convincing evidence, and that the prejudicial effect far outweighed any possible probative value. We must first decide whether this evidence is subject to the rule that evidence of other bad acts is generally inadmissible unless it falls within certain exceptions. Because these remarks present the risk that, under the circumstances of this case, the jurors could conclude that Whittlesey is a "bad person" and improperly infer guilt from this fact, we will once again treat this evidence as uncharged misconduct evidence.

██ The disputed evidence here, like appellant's statements concerning his knife, would be excluded if subjected to the requirement that they be established by clear and convincing evidence. The State never introduced any evidence that appellant carried out his plans to flee from prosecution or that he went on a crime spree. Rather, the evidence was introduced to show that Whittlesey was so concerned about prosecution that he talked about fleeing and that he contemplated

criminal acts to effectuate his flight. Thus, the evidence was not offered to prove the truth of the statements, but only to establish Whittlesey's state of mind, and, specifically, his consciousness of guilt.

Thus, as with the evidence relating the knife, if the State were required to prove by clear and convincing evidence that Whittlesey engaged in the conduct he described, the evidence would never be admissible. As far as the record shows, Whittlesey's ruminations about possible future criminal conduct were never converted into action. Appellant's statements were offered to show awareness of guilt, however, and they had probative value for that purpose regardless of whether Whittlesey ever executed his plans.

Because the statements were not offered to prove the bad acts they report, they fall within the special category of uncharged misconduct evidence that we identified in the preceding discussion. Evidence within this category is not subject to the clear-and-convincing requirement. Therefore, the fact that the misconduct described by Whittlesey may never have occurred is no bar to its admission.

Although the bad acts evidence before us need not satisfy the clear-and-convincing prong of the *Harris–Faulkner* test, it is still subject to the relevance and balancing requirements. As previously indicated, this evidence satisfies the relevance requirement, as it was offered to show Whittlesey's consciousness of guilt, not bad character or criminal propensity. It is well settled that evidence of flight is admissible to show awareness of guilt. *State v. Edison*, 318 Md. 541, 548, 569 A.2d 657, 660 (1990); *Hunt v. State*, 312 Md. 494, 508, 540 A.2d 1125, 1132 (1988). The portions of the tape concerning flight were inextricably intertwined with appellant's contemplation of crimes to support himself during flight. For instance, in the passage quoted above, redacting the portion after Whittlesey decided to forget about "that car" might have left the impression that he intended to abandon flight entirely. In this respect, and to the extent that it illustrated Whittlesey's zeal to leave town, the evidence was relevant to his

culpability for Griffin's murder. Finally, given the absence of proof that Whittlesey actually performed the acts he described, the prejudicial impact, if any, was slight.

For these reasons, we believe the circuit court did not err in admitting the evidence.

### D. *Jury Instruction on First Degree Murder*

Appellant's final exception to his conviction relates to the trial judge's jury instruction on first degree murder, specifically the definition of premeditation. In the instructions to the jury on first degree murder, Judge Wise explained:

> First degree murder is the killing of another person with willfulness, deliberation, and premeditation. In order to convict the Defendant of this type of first degree murder, the State must prove first that the conduct of the Defendant caused the death of Jamie Griffin and second, that the killing was willful, deliberate, and premeditated. Willful means that the victim's death was actually intended. Deliberate means the Defendant was conscious of the intent to kill and that he knew of that intent. Premeditated means that the Defendant thought about the killing and that there was time, though it need only have been brief, for the killer to fully form the conscious decision to kill. Premeditated intent to kill must be formed before the killing.

Whittlesey's attorney objected to the court's failure to instruct the jury in the language of the defense's proposed instruction. Whittlesey now argues that the instruction given contravened the dictates of *Willey v. State*, 328 Md. 126, 613 A.2d 956 (1992), because it failed to explain adequately the reflective intent that characterizes the difference between second degree murder and first degree premeditated murder.

The instruction given in this case was nearly identical to the instruction given by the trial court in *Willey*. As we said in that case, "[w]e see the instruction as encapsulating first degree murder as expounded by this Court and, consequently, we reject [the] contention that the instruction 'failed to convey

the essence of first degree murder as defined by this Court.' " 328 Md. at 136, 613 A.2d at 961; *see also Baker v. State,* 332 Md. 542, 567, 632 A.2d 783, 795 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994). Although it would have been better to include language to the effect that the defendant thought about the killing, and that there was enough time before the killing, though it may only have been brief, for the defendant to consider the decision whether to kill and enough time to weigh the reasons for and against the choice, we find that the instruction as given adequately conveyed the difference between second degree murder and premeditated first degree murder. We perceive no error.

### III.

Following the guilty verdict and sentencing proceeding, the same jury that found Whittlesey guilty of first degree murder unanimously determined his sentence to be death. Whittlesey presents seven grounds for vacating this sentence. We find merit in one of these assertions, which we now address.

At the sentencing proceeding, appellant sought to introduce various hearsay evidence in support of the mitigating circumstances he propounded. The trial judge excluded the proffered evidence on the grounds that it was hearsay; certain testimony was also ruled inadmissible on the alternative ground that it was not the best evidence. Appellant contends that the exclusion of this mitigating evidence violated both the United States Constitution and Maryland law applicable to capital sentencing proceedings. We agree that the trial court did not observe the evidentiary provisions of the death penalty statute. *See* Art. 27, § 413(c)(1). Accordingly, for the reasons set forth below, we vacate appellant's sentence and remand for a new sentencing hearing under § 413. *See* Art. 27, § 414(f)(2). We shall not reach the constitutional question.

The trial court excluded, on grounds of hearsay, testimony from four witnesses and numerous documents. The first witness was Hans Selvog, a social worker employed by the National Center on Institutions and Alternatives, who, accord-

ing to appellant, "prepared a comprehensive social history of the Whittlesey family in an effort to apprise the jury of Appellant's difficult family background." The trial judge, accepting the State's argument that the evidence was inadmissible because it was hearsay, excluded Selvog's testimony. Selvog had also prepared reports describing his interviews; the court refused to admit these reports as substantive evidence, but they were admitted, subject to a limiting instruction, to show the foundation for the opinion of a psychologist who testified later.

The next two witnesses the defense offered in mitigation were Lieutenant Sam Bowerman and Detective Mel Beitz, both of the Baltimore County Police Department. The trial judge excluded their testimony on the grounds of hearsay and the best-evidence rule.

The defense next offered Donald Steil, a private investigator under contract with the Maryland Public Defender's Office and a former parole and probation officer for the State of Maryland. Once again, the trial judge refused to admit the evidence based on hearsay grounds.

Appellant made extensive proffers concerning the content and purpose of the testimony he intended to produce through these witnesses. Much of the evidence was offered to show that Whittlesey's family life was marred by alcoholism, physical abuse, and violence and that, during elementary school, he suffered from a speech impediment requiring special schooling. The defense further proffered that this evidence would provide information about Whittlesey's relationship with Griffin and suggest that they both might have had gambling problems.

Appellant also attempted to introduce two sets of documents. The first were the certified hospital records pertaining to treatment of appellant's brother at Sheppard and Enoch Pratt Hospital in Baltimore County. They were offered to show the history of physical abuse and violence in appellant's family. Counsel suggested that this was germane to the

appellant's character and background.[11] The documents in the second group were notes from a witness interview from the police investigation of Griffin's disappearance; appellant did not proffer the content of the interview or the purpose for which it was offered. These documents were all excluded on grounds of hearsay.

The trial judge refused to admit the documents or the testimony as substantive evidence. Although he recognized that some of the proffered evidence was relevant, the court excluded it simply because it was hearsay in nature. At one point, the judge stated:

> I just can't believe when the stakes are as high as they are in a death penalty case that suddenly we're going to have less reliable evidence to decide the death penalty than we had to decide guilt or innocence. That's [a] new world to me and if it's, that's what the Court of Appeals intended, I think they should say it in loud and clear language so that the legislature and the public and everybody knows it and especially people who are this day being served notice of intent to seek the death penalty.

The court also cautioned defense counsel:

> [I]n this case, you want to relax [the evidentiary rules] because it suits you, but tomorrow it could come down like a ton of bricks on a lot of other people who might be facing the death penalty.

On a few occasions, the court also stated that the introduction of statements through hearsay witnesses rather than through the declarants themselves would not be permitted because the hearsay testimony would not be "the best evidence available." Based on these hearsay and best-evidence rulings, the court excluded all of this evidence.

---

11. Despite the exclusion of appellant's proffered evidence, the jury unanimously found as a mitigating circumstance that Whittlesey came from a dysfunctional family. The admission of additional evidence, however, might have enhanced the weight of this mitigator in the jury's final balancing process.

With regard to the best-evidence rule, we stated in *Trimble v. State*, 300 Md. 387, 403, 478 A.2d 1143, 1151 (1984), *cert. denied*, 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985):

> Generally, the [best evidence] rule applies to require a party to produce the original of a document instead of a duplicate or copy. Here, Trimble maintains that Dr. Blumberg's testimony about Dr. Freinek's prescription policies is not admissible because Dr. Freinek's own testimony as to his policies is the best evidence. Obviously, Dr. Freinek's testimony would not be documentary evidence, so the purposes of the best-evidence rule—to ensure that the exact terminology of a writing is presented to the court and to guard against fraud—are inapplicable.

The best-evidence rule has no application to the issue at hand and the trial court erred in excluding the evidence on this basis.

Respecting the trial court's hearsay rulings, we again find error. The court should have made individual determinations of the reliability of the proffered evidence, rather than ruling all of the hearsay evidence *per se* inadmissible.

In Maryland, the admission of evidence at capital sentencing proceedings is governed by Art. 27, § 413(c)(1), which permits the following evidence to be introduced:

(i) Evidence relating to any mitigating circumstance listed in subsection (g) of this section;

(ii) Evidence relating to any aggravating circumstance listed in subsection (d) of this section of which the State had notified the defendant pursuant to § 412(b) of this article;

(iii) Evidence of any prior criminal convictions, pleas of guilty or nolo contendere, or the absence of such prior convictions or pleas, to the same extent admissible in other sentencing procedures;

(iv) Any presentence investigation report. However, any recommendation as to sentence contained in the report is not admissible; and

(v) Any other evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements.

This provision was enacted as part of the original bill codifying Maryland's current capital sentencing procedure, *see* 1978 Maryland Laws ch. 3, § 2, at 8, and it has not been substantively amended since enactment.

In the past, we have observed that the provisions of this statute "are somewhat more restrictive as to the admissibility of evidence at the sentencing proceedings of death penalty cases than is normally the case in a sentencing proceeding in a nondeath penalty case." *Johnson v. State*, 303 Md. 487, 525, 495 A.2d 1, 20 (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986). We have never, however, held that § 413(c)(1) requires that evidence offered at a capital sentencing hearing satisfy the requirements applicable to trial evidence.

Our construction of § 413(c)(1) that is most apposite to the instant case appeared in the appendix to our opinion in *Reid v. State*, 305 Md. 9, 501 A.2d 436 (1985). In *Reid*, the defendant sought to introduce letters suggesting lack of future dangerousness. We initially held that the trial court should have admitted the letters, notwithstanding their hearsay content. We withdrew this opinion prior to the issuance of the mandate, however, upon the State's assertion that the letters were fraudulent; we ordered a limited remand to establish the authenticity of the letters, to be followed by a resentencing hearing if the letters turned out to be authentic. The withdrawn opinion was attached as an appendix to our final decision.

The holding of this opinion, withdrawn for reasons unrelated to this holding, was that § 413(c)(1) requires that evidence be reliable, but not that it comply with the strict standards applicable in the guilt-or-innocence phase of the trial. *Id.* at 27–28, 501 A.2d at 445. We reiterate what we said there:

> The reference to "evidence" in § 413(c) does not establish a requirement that the strict rules of evidence are to be followed in the sentencing phase of a capital case.

*Id.*, 501 A.2d at 445. Thus, in determining the admissibility of evidence at a sentencing proceeding, the court should not merely apply the evidentiary standards that would govern at trial. Instead, the court must exercise its "broad authority to admit evidence it deems probative and relevant to sentencing." *Harris,* 306 Md. at 366, 509 A.2d at 131.

In this case, however, even as the trial judge conceded that at least some of the proffered evidence was relevant, he refused to consider whether it was reliable, based on the incorrect notion that hearsay evidence was *per se* inadmissible. This failure to exercise discretion was error.[12]

 Although our decision is based on Maryland's death penalty statute, we note that, under the common law applicable in non-capital cases, "[t]he strict rules of evidence do not apply at a sentencing proceeding." *State v. Dopkowski,* 325 Md. 671, 680, 602 A.2d 1185, 1189 (1992); *Smith v. State,* 308 Md. 162, 166, 517 A.2d 1081, 1083 (1986). As the Supreme Court has observed, this principle has deep roots in our law; moreover, it is essential to the modern practice of tailoring punishment to fit the offender. *See Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).

 The reasons for relaxing the rules of evidence apply with particular force in the death penalty context. In a capital

---

**12.** This case was tried before the Maryland Rules of Evidence went into effect. We note for future guidance, however, that the Rules expressly do not apply in capital sentencing proceedings. The committee note to Maryland Rule 5–101 reads:

> The Rules in this Chapter are not intended to limit the Court of Appeals in defining the application of the rules of evidence in sentencing proceedings in capital cases or to override specific statutory provisions regarding the admissibility of evidence in those proceedings. *See,* for example, *Tichnell v. State,* 290 Md. 43[, 427 A.2d 991] (1981); Code, Article 41, § 4–609(d).

*Cf.* Maryland Rule 5–101(b)(9) (providing that the Rules do not apply to non-capital sentencing proceedings).

sentencing proceeding, the United States Constitution requires that the defendant have the opportunity to present all relevant mitigating evidence. *See Penry v. Lynaugh,* 492 U.S. 302, 317, 109 S.Ct. 2934, 2946, 106 L.Ed.2d 256 (1989); see also *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (plurality opinion of Burger, C.J.). This does not require the admission of unreliable evidence. *See Green v. Georgia,* 442 U.S. 95, 97, 99 S.Ct. 2150, 2151, 60 L.Ed.2d 738 (1979) (per curiam) (discussing the reliability of a specific hearsay statement before holding that its admission at Green's capital sentencing hearing was constitutionally required); *see also People v. Fudge,* 7 Cal.4th 1075, 31 Cal. Rptr.2d 321, 350, 875 P.2d 36, 65 (1994) (stating that *Green* does not require the admission of unreliable evidence), *cert. denied,* — U.S. ——, 115 S.Ct. 1367, 131 L.Ed.2d 223 (1995); *cf. People v. Edwards,* 144 Ill.2d 108, 161 Ill.Dec. 788, 816, 579 N.E.2d 336, 364 (1991) (mitigating evidence is inadmissible if unreliable), *cert. denied,* 504 U.S. 942, 112 S.Ct. 2278, 119 L.Ed.2d 204 (1992); *State v. Pitts,* 116 N.J. 580, 562 A.2d 1320, 1349–50 (1989) (same); *but cf. State v. Ross,* 230 Conn. 183, 646 A.2d 1318, 1365 (Conn.1994) (finding that the state death penalty statute requires the admission of mitigating evidence without regard to reliability). Nevertheless, as a matter of due process, " 'the hearsay rule may not be applied mechanistically to defeat the ends of justice.' " *Green,* 442 U.S. at 97, 99 S.Ct. at 2151 (quoting *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973)).

Finally, we do not anticipate that this holding will "come down like a ton of bricks" on future capital defendants, as the trial court suggested it would. Our holding poses little risk to defendants because the State is already permitted to introduce hearsay evidence. In the court below, for example, the State introduced a Pre–Sentence Investigation report, containing hearsay statements by the investigator who prepared it. The PSI, containing reliable hearsay, was admissible pursuant to § 413(c)(1)(iv) of Article 27. It is thus apparent that to read the statute as the trial court did would not protect defendants,

but would instead result in applying the hearsay rule asymmetrically in favor of the State.

At appellant's resentencing, should the State choose to pursue the death penalty on remand, the trial court must exercise its discretion and shall admit any relevant and reliable mitigating evidence, including hearsay evidence that might not be admissible in the guilt-or-innocence phase of the trial. This relaxed standard for admissibility of evidence will ensure that the fact finder has the opportunity to consider "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. at 604, 98 S.Ct. at 2964 (plurality opinion of Burger, C.J.).

## IV.

There remain for our consideration three assertions which, if decided favorably to appellant, would prevent the State from seeking the death penalty in this case. These are appellant's double jeopardy exceptions to his sentence, his contention that the Maryland death penalty statute is unconstitutional, and his claim of deficient notice of the State's intention to seek the death penalty.

### A. *Double Jeopardy*

At the same time that he killed Jamie Griffin, Whittlesey robbed Griffin of his car and numerous other possessions. He was convicted of this robbery in 1984, six years before he was charged with Griffin's murder. In the instant murder prosecution, the State relied on this robbery as the predicate felony to support the charge of felony murder, and also as the aggravating circumstance necessary to seek a sentence of death. *See* § 413(d).

Appellant contends that the robbery trial in 1984 and the murder trial and capital sentencing proceeding presently before us constitute three separate prosecutions. Moreover, he notes that all three of these proceedings involved related acts; in particular, the robbery conviction, the felony murder convic-

tion, and the death sentence are all predicated on proof of the same robbery. Whittlesey claims that reliance on the same robbery in multiple proceedings violates the Double Jeopardy Clause of the United States Constitution [13] and Maryland's common-law double jeopardy prohibition.

This claim breaks down into four separate objections: that the Double Jeopardy Clause barred the murder trial; that the common law barred the murder trial; that the Double Jeopardy Clause barred the sentencing; and that the common law barred the sentencing. We will address each of these in turn.

### Constitutional Bar to the Murder Trial.

Appellant first argues that double jeopardy principles would bar separate prosecutions of the robbery and the murder. Whittlesey raised this claim prior to trial, in a motion to dismiss this case. The trial court denied this motion, and we affirmed in *Whittlesey I*. In *Whittlesey I*, we held that the State could prosecute Whittlesey for murder, despite the constraints of the Double Jeopardy Clause, because this case fell within the exception enunciated by the Supreme Court in *Diaz v. United States*, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912). *Whittlesey I*, 326 Md. at 528, 606 A.2d at 238. Whittlesey's pre-trial motion to dismiss did not rely on Maryland's common-law double jeopardy prohibition. *Id.* at 521–22, 606 A.2d at 234.

Appellant now reasserts his double jeopardy challenge to the murder trial, relying on both the Constitution and Maryland common law. We addressed the application of the Double Jeopardy Clause to this case in *Whittlesey I*, and we will not reexamine our conclusions in that decision. *See* Maryland Rule 8–131(d).

### Common–Law Bar to the Murder Trial.

Whittlesey also contends that the prosecution for murder was barred by the common-law prohibition against double

---

**13.** "No person shall ... be subject for the same offence to be twice put in jeopardy of life or limb...." U.S. Const. amend. V.

jeopardy. He did not raise this objection and we did not consider it in *Whittlesey I.* The State asserts, however, that this claim is preempted by the law of the case. Citing *Loveday v. State,* 296 Md. 226, 462 A.2d 58 (1983), the State argues that "neither the questions decided [in a prior appeal] nor the ones that could have been raised and decided are available to be raised in a subsequent appeal." *Id.* at 230, 462 A.2d at 59 (citations omitted). We will not address the State's law of the case argument, however, because, as we now explain, we uphold appellant's conviction on another basis.

▮▮▮▮▮ Appellant's common law objection is limited to the trial for felony murder; he effectively concedes that there was no common-law double jeopardy bar to trying him for premeditated murder.[14] The verdict sheet from trial specifically indicates that the jury found appellant guilty of both premeditated and felony murder. Thus, Whittlesey was eligible to stand trial for premeditated murder and was found guilty of that offense.[15]

---

**14.** In *Whittlesey I,* we assumed arguendo that the Double Jeopardy Clause would bar trial for either felony murder or premeditated murder. 326 Md. at 523, 606 A.2d at 235. This assumption was based on *Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990) (holding that the Double Jeopardy Clause prohibits successive prosecutions based on the same conduct), *overruled by United States v. Dixon,* —— U.S. ——, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). *Grady,* which governed the application of the Double Jeopardy Clause when *Whittlesey I* was decided, provided more expansive double jeopardy protection than the common law. *See Dixon,* —— U.S. at ——, 113 S.Ct. at 2860. Appellant does not contend that the trial for premeditated murder was encompassed within the common-law prohibition against double jeopardy.

**15.** The dissent argues that, because Whittlesey "previously had been placed in jeopardy for first degree murder, via his robbery prosecution and conviction, ... [he] should never have been tried for first degree murder on *any* theory." Dissenting Op. at 99 (citation omitted). This conclusion appears to be based on the premise that "when there has been a prior conviction for an underlying felony, there necessarily has been a prior prosecution for first degree murder." Dissenting Op. at 96–97.

The dissent cites no support for this view. In fact, as Judge Eldridge wrote in his separate opinion in *Whittlesey I:*

Furthermore, appellant has not indicated that the submission of a felony murder theory contributed in any way to the jury's conclusion with respect to premeditated murder. *Cf. Morris v. Mathews*, 475 U.S. 237, 246–47, 106 S.Ct. 1032, 1037–38, 89 L.Ed.2d 187 (1986) (holding that, under the Double Jeopardy Clause, a defendant bears the burden of establishing that a guilty verdict on a nonjeopardy-barred charge was tainted by the presence at trial of a jeopardy-barred charge). Accordingly, we reject appellant's double jeopardy challenge to the murder trial.

*Constitutional Bar to the Sentencing Proceeding.*

Whittlesey also contends that the 1984 prosecution for robbery bars the use of the robbery as an aggravator in the death penalty hearing.[16] This argument proceeds as follows:

> It is ... well-established ... that a felony such as robbery, rape, or kidnapping, and a wilful, deliberate and premeditated murder (or any species of murder other than felony murder), both arising out of the same transaction, are *not* deemed the same offense for double jeopardy purposes. *See, e.g., State v. Frye*, 283 Md. [709,] 716, 393 A.2d [1372,] 1376 [ (1978) ] ("if a first degree murder conviction is premised upon independent proof of wilfulness, premeditation and deliberation under Art. 27, § 407, then the murder, even though committed in the course of a felony, would not be deemed the same offense as the felony ...").
>
> Consequently, under long-established double jeopardy principles, the double jeopardy prohibition does not bar the prosecution of a defendant for an intentional homicide, even though the defendant was earlier prosecuted and convicted for robbing, raping, or kidnapping the same victim. *See, e.g., Bowers v. State*, 298 Md. 115, 140–43, 468 A.2d 101, 114–16 (1983) (earlier kidnapping prosecution and conviction did not preclude subsequent murder prosecution where the murder prosecution was based on proof of willfulness, premeditation and deliberation).

*Whittlesey I*, 326 Md. at 537–38, 606 A.2d at 242 (Eldridge, J., concurring in part and dissenting in part) (some citations omitted).

16. Whittlesey does not contend that the use of the robbery as a predicate felony in the murder prosecution and as an aggravator in the capital sentencing hearing constitutes double jeopardy. *See Schiro v. Farley*, — U.S. —, —, 114 S.Ct. 783, 790, 127 L.Ed.2d 47 (1994) (rejecting such a claim); *Stebbing v. State*, 299 Md. 331, 359–60, 473 A.2d 903, 917, *cert. denied*, 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984); *cf. infra* Section IV.B (addressing appellant's Eighth Amend-

A capital sentencing proceeding is the equivalent of a trial. In this case, the robbery was an element of the State's case at the capital sentencing. Thus, Whittlesey has been subjected to two separate trials concerning the same offense, and this violates the constitutional bar against retrial after conviction and its common-law analogue, the principle of *autrefois convict*. Finally, Whittlesey asserts, the *Diaz* exception on which this Court relied in *Whittlesey I* does not apply in this situation.

The State contends that these claims are barred by the doctrine of the law of the case. The law of the case would only govern this question if Whittlesey could have raised objections to the sentencing hearing before he was tried and convicted, a proposition we find doubtful. Once again, however, we need not decide whether the law of the case doctrine precludes Whittlesey's claims, because we reject them on a separate basis.

■ To the extent that appellant's claim relies on the constitutional double jeopardy prohibition, we have already addressed it. In *Whittlesey I*, we stated, "[I]n light of our conclusion, if Whittlesey is found guilty of murder in the first degree, the State may seek a sentence of death even though the aggravating circumstance" is the robbery of Griffin. 326 Md. at 535, 606 A.2d at 241. Appellant argues that this statement was dictum, because sentencing issues were not before us in *Whittlesey I*. This point is academic; we adhere to our reasoning in *Whittlesey I* and the conclusions that flow therefrom.

*Common–Law Bar to the Sentencing Proceeding.*

■ To the extent that appellant's claim arises from Maryland's common-law double jeopardy bar, however, it is not foreclosed by *Whittlesey I*, because no common-law-based objection to the sentencing was presented or considered in

---

ment challenge to the use of the robbery as both a predicate felony and an aggravator).

that case. We conclude, however, that common-law double jeopardy principles do not permit appellant to plead his robbery conviction in bar to the sentencing proceeding.

Although his overall argument is grounded in the common law, appellant relies on constitutional authority to support the premise that a sentencing hearing is the equivalent of a trial. He cites *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), in which the United States Supreme Court held that the defendant, having once been sentenced to life in a death penalty hearing, could not thereafter be sentenced to death. Assuming *arguendo* that Maryland's common-law double jeopardy doctrine incorporates *Bullington* or that the principles supporting it govern, we find that case inapplicable to the circumstances before us.

*Bullington* involved a bifurcated prosecution, in which the defendant was first convicted of murder and then, following a separate hearing, sentenced to life imprisonment. After Bullington was sentenced, the trial court granted his motion for a new trial on guilt or innocence. The State served notice of its intent to seek the death penalty in the second proceeding. Bullington moved to strike the notice, and the trial court granted the motion. On interlocutory appeal, the intermediate appellate court affirmed, but the Supreme Court of Missouri reversed, holding that Bullington was death eligible despite the jury's decision in the first sentencing proceeding.

The United States Supreme Court reversed the Supreme Court of Missouri. *Bullington,* 451 U.S. at 446–47, 101 S.Ct. at 1862. The Court held that the Double Jeopardy Clause would bar the State from seeking the death penalty again, because the original sentencing jury had rejected that option and selected a life sentence instead. *Id.* at 446, 101 S.Ct. at 1862. The Court noted that the Double Jeopardy Clause ordinarily does not limit the sentencing authority's discretion at a resentencing proceeding. It carved out a narrow exception to this rule, however, for bifurcated capital cases like *Bullington.* The Court noted that capital sentencing procedures in Missouri incorporated many of the attributes of a

trial on guilt or innocence, including the use of a jury as finder of fact, the requirement that the State prove facts beyond those adduced at trial on guilt or innocence, and the use of the "beyond a reasonable doubt" standard. Concluding that the State had failed to meet its burden in the prior capital proceeding, the Court held that the imposition of a life sentence operated as the functional equivalent of an acquittal on the State's "charge" that Bullington should be sentenced to death. *Id.* at 445, 101 S.Ct. at 1861.

Appellant gleans from *Bullington* that a trial-type sentencing proceeding must be treated like a trial for double jeopardy purposes. The short answer to this contention is provided by *Schiro v. Farley,* —— U.S. ——, ——, 114 S.Ct. 783, 790, 127 L.Ed.2d 47 (1994), in which the Supreme Court held that the Double Jeopardy Clause did not bar the use of a single rape as both a predicate felony in a murder trial and then as an aggravating factor in the ensuing capital sentencing hearing. *Schiro* can be read in either of two ways. First, the Court's reference to "the *Bullington* prohibition against a second capital sentencing proceeding" suggests that the *Bullington* doctrine can never apply to a defendant's initial sentencing proceeding. On this reading, it is clear that *Bullington* does not apply to the case at bar. *See Stebbing,* 299 Md. at 359, 473 A.2d at 917 (*Bullington* does not apply to a defendant's first sentencing hearing).

There is a second possible reading of *Schiro,* however, which is that the sentencing proceeding in that case was permissible only because it occurred "in the course of a single prosecution" for capital murder. —— U.S. at ——, 114 S.Ct. at 790. This reading of *Schiro* is inapposite in this case, where appellant does not claim that the murder prosecution precludes the sentencing, but rather that the earlier, separate prosecution for robbery bars the capital sentencing proceeding.

Even if we were to follow this second reading of *Schiro,* however, we would still find that *Bullington* cannot carry the load that Whittlesey has assigned to it. To explain this

conclusion requires an examination of constitutional double jeopardy doctrine.

In *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969), the Supreme Court stated that the Double Jeopardy Clause provides three guarantees:

> It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.

This list is not exhaustive; the Double Jeopardy Clause also, among other things, furnishes a defendant with the right to assert collateral estoppel to bar the relitigation of facts found in prior prosecutions. *Ashe v. Swenson*, 397 U.S. 436, 444–45, 90 S.Ct. 1189, 1194–95, 25 L.Ed.2d 469 (1970).

At the intersection of the guarantee against retrial after acquittal and the doctrine of collateral estoppel lies a cluster of precedents that require the application of the Double Jeopardy Clause in contexts where it ordinarily does not operate. Whereas the protections of the Double Jeopardy Clause may be invoked in certain circumstances even where prior proceedings resulted in a mistrial or a judgment against the defendant, the decisions in this cluster apply only to situations where a fact finder has rendered a verdict in favor of the defendant or a court has concluded as a matter of law that the State had failed to prove its case. As we now explain, without a prior acquittal or finding of insufficient evidence, Whittlesey cannot rely on these cases.

One of the cases in this cluster is *Burks v. United States*, 437 U.S. 1, 14–16, 98 S.Ct. 2141, 2148–49, 57 L.Ed.2d 1 (1978), which held that, contrary to the usual rule permitting retrial after a conviction is reversed on appeal, the Double Jeopardy Clause bars a new trial if the basis for reversal is insufficiency of the evidence. *See also Mackall v. State*, 283 Md. 100, 113–14, 387 A.2d 762, 769–70 (1978).

Another important case in this cluster is *Green v. United States*, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). In

*Green,* the defendant was charged with first degree murder, but the jury returned a verdict of second degree murder; his conviction was reversed on appeal, and, on retrial, he was found guilty of first degree murder. The Supreme Court reversed, holding that the verdict of guilty on a lesser included offense constituted an "implicit acquittal on the charge of first degree murder." *Id.* at 190, 78 S.Ct. at 225. Having been acquitted of first degree murder, the Supreme Court held, Green could not be retried for that offense. *Id.; see also Huffington v. State,* 302 Md. 184, 191, 486 A.2d 200, 203–04 (1985).

*Bullington,* which lies at the heart of appellant's double jeopardy claim, builds on *Green* by applying the principle of implicit acquittal in the context of capital sentencing. Like its antecedents, *Bullington* establishes an exception under which the Double Jeopardy Clause applies in a situation where it ordinarily would not apply. *Robinson v. Wade,* 686 F.2d 298, 310 (5th Cir.1982). This exception only applies where the defendant has already won a judgment in his favor. *See id.* ("The [Supreme] Court's approach [in *Bullington* ] bears a strong resemblance to concepts of issue preclusion....").

Thus, *Bullington* does not equate sentencing hearings with trials for all purposes; it merely secures to the defendant the right not to be convicted of a penalty of which he has already been acquitted. *Cf. State v. Young,* 173 W.Va. 1, 311 S.E.2d 118 (W.Va.1983) (applying *Green* and holding that, where a defendant has been charged with first degree murder and convicted of a lesser included offense and this conviction is reversed, the defendant may not thereafter be convicted of first degree murder but may nevertheless be retried on the original indictment). As we explained in *Harris v. State,* 312 Md. 225, 239–40, 539 A.2d 637, 644 (1988), *Bullington* only applies where the result of some prior proceeding can be "equated to an acquittal ... [or] treated as the functional equivalent of a reversal of a conviction for insufficient evidence."

Other courts have reached similar conclusions. *See, e.g.,* *Knapp v. Cardwell,* 667 F.2d 1253, 1265 (9th Cir.) (defendants whose death sentences were reversed on legal grounds were never "acquitted" of the death penalty and cannot rely on *Bullington* ), *cert. denied,* 459 U.S. 1055, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982); *Godfrey v. State,* 248 Ga. 616, 284 S.E.2d 422, 426 (1981) (holding that, after reversal of a death sentence because the sole aggravating factor was constitutionally infirm, the State could seek the death penalty again, because the grounds for reversal did not go to the sufficiency of the evidence), *conviction vacated on habeas corpus sub nom. Godfrey v. Francis,* 613 F.Supp. 747 (N.D.Ga.1985), *aff'd sub nom. Godfrey v. Kemp,* 836 F.2d 1557 (11th Cir.1988) (accepting the basic formula that the State could seek the death penalty a second time if the grounds for reversal did not relate to sufficiency, but holding, contrary to the state court, that the grounds for reversal in the case before it implicated sufficiency), *cert. dismissed,* 487 U.S. 1264, 109 S.Ct. 27, 101 L.Ed.2d 977 (1988). Even those courts that have emphasized *Bullington* 's reliance on the trial-like aspects of capital sentencing have declined to apply *Bullington* where no court or finder of fact has determined that the State had failed to prove its case. *See, e.g., State v. Cullen,* 646 S.W.2d 850, 857 (Mo.Ct.App. 1982).

Whittlesey has no prior verdict in his favor on which to rely, and his reliance on *Bullington* is therefore misplaced. Accordingly, we hold that Maryland's common-law double jeopardy bar presents no obstacle to subjecting appellant to death penalty proceedings.

### B. *Constitutionality of the Maryland Death Penalty Statute*

Appellant alleges that Maryland's death penalty procedure, established by § 413, is unconstitutional in two respects. First, he contends that the use of a single offense as both the predicate felony in a felony murder conviction and an aggravator making such murder capital violates the Eighth Amend-

ment to the United States Constitution.[17] Second, appellant objects to the apportionment of the burden of proof as to certain issues to be decided by the sentencing authority. We have addressed both of these challenges before and found no merit in them. *See Wiggins v. State,* 324 Md. 551, 582–83, 597 A.2d 1359, 1374 (1991) (rejecting the argument concerning the burden of proof), *cert. denied,* 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992); *Calhoun v. State,* 297 Md. 563, 629, 468 A.2d 45, 77 (1983) (rejecting the argument concerning double counting of the same felony), *cert. denied sub nom. Tichnell v. Maryland,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984). Appellant has not indicated that any developments since these decisions require that they be reversed. Consequently, we shall not reexamine these precedents.

## C. *Notice of Intent to Seek the Death Penalty*

The State timely served defense counsel with notice of intent to seek the death penalty, as required by § 412(b). Appellant claims, however, that § 412(b) required delivery of the notice directly to him, rather than to his counsel. We disagree. When a defendant is represented by counsel, service of the notice to seek the death penalty is properly made upon the attorney. *See* Maryland Rule 1–321(a). Thus, there was no error; notice was served in compliance with the requirements of § 412(b).

## V.

In light of our holding, we need not address the remaining issues raised by the appellant. Because the State may pursue the death penalty on remand, however, we will address two of the remaining issues for guidance. These issues concern the use of leg restraints on appellant during the sentencing hear-

---

17. "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

ing and the State's introduction of a videotape of Jamie Griffin as victim impact evidence.

## A. *Shackling*

Once appellant had been convicted, the Department of Corrections ("DOC") personnel placed leg irons on Whittlesey with the intent that they be worn during the sentencing proceeding. On the first morning of the sentencing phase, before the jury arrived, defense counsel asked that Whittlesey not be required to appear before the jury in leg restraints; counsel also requested that, if the court decided to permit the restraints, it should instruct the jury that Whittlesey was shackled pursuant to the DOC's standard policy.

Before ruling on this motion, the judge solicited opinions from the State, which took no position, and the DOC representative in the courtroom, who informed the judge that DOC's standard policy is to put some form of restraint on defendants during capital sentencing hearings. In addition, the DOC representative gave the trial judge a transportation unit envelope, with the block checked "yes, escape risk history." Defense counsel specifically declined the court's invitation to inquire further into this reference and did not refute the escape risk classification.

The court then followed the DOC recommendation, noting a recent escape by a different defendant:

> We're supposed to learn from experience and as I'm sure the DOC officers are painfully aware, there was incident within the last month ... in which a respondent was not shackled and took advantage of that situation. Mr. Whittlesey, you're going to pay for that, unfortunately....

The court agreed, however, to give appellant's requested instruction concerning the restraints.

The trial judge has broad discretion in maintaining courtroom security. In exercising this discretion, the decision as to whether an accused should wear leg cuffs or shackles must be made by the judge personally, and may not be delegated to courtroom security personnel. As we noted in

*Bowers v. State,* 306 Md. 120, 507 A.2d 1072, *cert. denied,* 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986):

> It is [the trial judge] who is best equipped to decide the extent to which security measures should be adopted to prevent disruption of the trial, harm to those in the courtroom, escape of the accused, and the prevention of other crimes. As a discretionary matter, the district judge's decision with regard to measure[s] for security is subject to a limited review to determine if it was abused. We stress that the discretion is that of the district judge. He may not, as is suggested at one part in the record before us, delegate that discretion to the Marshal.

*Bowers,* 306 Md. at 133, 507 A.2d at 1078 (quoting *United States v. Samuel,* 431 F.2d 610, 615, *final decision entered,* 433 F.2d 663 (4th Cir.1970), *cert. denied,* 401 U.S. 946, 91 S.Ct. 964, 28 L.Ed.2d 229 (1971)) (alterations in original) (citations omitted).

 A judge's discretion over the use of restraints during the guilt-or-innocence phase of a trial is limited by the Due Process Clause,[18] because such restraints might derogate the presumption of innocence in the eyes of the jury. *See Estelle v. Williams,* 425 U.S. 501, 504–06, 96 S.Ct. 1691, 1693–94, 48 L.Ed.2d 126 (1976); *Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). In a sentencing proceeding, however, unlike the trial on guilt or innocence, the presumption of innocence does not apply. *Bowers,* 306 Md. at 132, 507 A.2d at 1078.

We have nevertheless determined that a defendant is entitled to an individualized evaluation of both the need for shackling and the potential prejudice therefrom. *Hunt v. State,* 321 Md. 387, 583 A.2d 218 (1990), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1992). In *Hunt,* we discussed the procedure a trial judge should employ when

---

**18.** "No State shall ... deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1.

considering extraordinary security measures. Judge Chasanow, writing for the Court, noted:

> Such procedures should include hearing any argument on the issue out of the presence of the jury, affording the defendant an opportunity to rebut, and upon request, issuing cautionary instructions to the jury or polling the jurors to determine if they would be disposed against the defendant because of the security measures.

*Id.* at 413, 583 A.2d at 230–31. These procedures were generally followed by the trial judge.

■■■ It is, however, incumbent upon the trial judge to ensure that the record reflects the reasons for the imposition of extraordinary security measures. In this case, we are uncertain whether the trial judge ordered the physical restraints based on general policy of the Department of Corrections, the unrebutted classification of the appellant as an escape risk, or an unfortunate incident that occurred in Baltimore City. On remand, we urge the trial judge to follow the directives set out in *Hunt* and *Bowers* before employing any extraordinary security measure and to articulate the reasons underlying any such decision.

### B. *Victim Impact Evidence*

■■■ Finally, appellant takes exception to the introduction at his sentencing hearing of a videotape of Jamie Griffin. The tape showed approximately 90 seconds of Griffin playing the piano, a skill for which he had been nationally recognized. The State maintains that the videotape gave a human dimension to Griffin that was ostensibly lacking in the other evidence. *See Payne v. Tennessee*, 501 U.S. 808, 831, 111 S.Ct. 2597, 2611, 115 L.Ed.2d 720 (1991) (O'Connor, J., concurring) (victim impact evidence ensures that the victim will not "remain a faceless stranger" in the eyes of the jury). Appellant concedes that such victim impact evidence is admissible under § 413. *Evans v. State*, 333 Md. 660, 687, 637 A.2d 117, 130 (1994); *see also* Art. 27, § 643D. Appellant also concedes that this evidence is not prohibited by the United States Constitu-

tion. *Payne,* 501 U.S. at 825, 830, 111 S.Ct. at 2608, 2611. Appellant also does not contend that the videotape was "unduly inflammatory," the limit we have placed on the admissibility of victim impact evidence. *See Evans,* 333 Md. at 689, 637 A.2d at 131. Instead, appellant's objection is limited to the relevance of the evidence; specifically, appellant claims that Griffin's parents had already testified about his talent for the piano, so the videotape was cumulative.

We have defined *cumulative* to mean "unnecessarily redundant." *Robinson v. State,* 315 Md. 309, 322, 554 A.2d 395, 401 (1989). In reviewing objections based on relevance, great deference is afforded the trial judge in regulating the conduct of a trial. *See State v. Booze,* 334 Md. 64, 68, 637 A.2d 1214, 1216 (1994). Here, the court gave a thorough hearing to appellant's motion in limine to exclude the tape and found that the videotape would provide the jury with information not already in evidence. For instance, the judge noted that the videotape illustrated Griffin's piano skill better than any still photograph could portray this talent. Also, because the victim's body had been buried so long before it was discovered, the pictures of his remains did not effectively portray his appearance at the time of his death; the videotape met this need.

We find no abuse of discretion in the court's determination that the videotape of Jamie Griffin provided relevant information not already in evidence.

## VI.

In sum, we affirm Whittlesey's conviction. For the reasons we have stated, however, we vacate appellant's sentence and remand for further proceedings consistent with this opinion.

*JUDGMENT AFFIRMED EXCEPT AS TO THE IMPOSITION OF THE DEATH SENTENCE; DEATH SENTENCE VACATED AND CASE REMANDED TO THE CIRCUIT COURT FOR CAROLINE COUNTY FOR A NEW*

*SENTENCING PROCEEDING. COSTS TO BE PAID BY BALTIMORE COUNTY.*

BELL, J., concurring in part and dissenting in part.

BELL, Judge, concurring and dissenting.

The majority vacates the death penalty sentence imposed upon Michael Whittlesey, the petitioner, and orders a new sentencing hearing, holding that the trial court erred in excluding, as hearsay, certain mitigating evidence offered by the petitioner during the sentencing proceeding. It rejected each and every one of the petitioner's other challenges it considered. While I agree that the ruling was error and, thus, the petitioner is entitled to a new sentencing hearing on that account, I also find merit in several of the other challenges, among them the double jeopardy argument and the *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) contention. Because resolution of the double jeopardy issue implicates the propriety of the capital proceedings themselves and the *Batson* challenge implicates the integrity of the petitioner's conviction, even if the capital proceedings were appropriate, which I do not believe to be so, I would, nevertheless, reverse the petitioner's convictions.

## I.

This is the second time this case has reached this Court. In the first case, *Whittlesey v. State,* 326 Md. 502, 606 A.2d 225 (1992) (*Whittlesey I*), the issue was "whether the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States prohibits the prosecution of Michael Whittlesey for the murder of James Rowan Griffin, known as Jamie." *Id.* at 504, 606 A.2d at 226 (footnote omitted). This Court held that it did not. To reach that conclusion, the majority formulated a "reasonable prosecutor" test, under which

a subsequent indictment on a second offense, otherwise barred by the Double Jeopardy Clause of the Fifth Amendment, is not barred if, at the time of prosecution for the

earlier offense a reasonable prosecutor, having full knowledge of the facts which were known and in the exercise of due diligence should have been known to the police and prosecutor at that time, would not be satisfied that he or she would be able to establish the suspect's guilt beyond a reasonable doubt.

*Id.* at 525, 606 A.2d at 236. The majority did not separately consider the propriety of the State's trying the petitioner on a premeditated murder theory. Instead, it adopted the assumption that the prosecution of premeditated murder, although not barred under *Blockburger [v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932) ], is barred under [*Grady v.] Corbin* [495 U.S. 508, 510, 110 S.Ct. 2084, 2087, 109 L.Ed.2d 548, 557 (1990) ]. *Whittlesey I,* 326 Md. at 526, 606 A.2d at 237.

In a concurring and dissenting opinion, Judge Eldridge specifically opined that a prosecution premised on the murder being premeditated was not barred by double jeopardy. He reasoned that robbery and premeditated murder are not the same offense under the *Blockburger* test: "It is equally well-established, however, that a felony such as robbery, rape, or kidnapping, and a wilful, deliberate and premeditated murder (or any species of murder other than felony murder), both arising out of the same transaction, are *not* deemed the same offense for double jeopardy purposes." *Whittlesey I,* 326 Md. at 537, 606 A.2d at 242 (Eldridge, J., concurring and dissenting), citing, among others, *State v. Frye,* 283 Md. 709, 716, 393 A.2d 1372, 1376 (1978), *Newton v. State,* 280 Md. 260, 269, 373 A.2d 262, 267 (1977). Judge Eldridge did not share the majority's view with respect to felony murder, however. That offense, he believed, was the same offense as the underlying felony. *Whittlesey I,* 326 Md. at 537, 606 A.2d at 242. Therefore, he concluded, in the case before the Court, the prior conviction for robbery precluded a subsequent prosecution for felony murder. *Id.* at 542, 606 A.2d at 244–45. He also rejected the majority's reasonable prosecutor test as an appropriate interpretation or extension of the double jeopardy exception recognized in *Diaz v. United States,* 223 U.S. 442, 32

S.Ct. 250, 56 L.Ed. 500 (1912).[1] *Whittlesey I*, 326 Md. at 548, 606 A.2d at 248. He pointed out that "[t]he *Diaz* rationale is that the subsequent prosecution for the greater offense is not barred when a necessary element of the greater offense had not occurred at the time of the earlier prosecution." *Id.* at 543, 606 A.2d at 245 (Eldridge, J., concurring and dissenting).

In a dissenting opinion, joined by Judge Chasanow, I, like Judge Eldridge, took the position that felony murder was the same offense as the underlying felony. Thus, where the underlying felony has been charged and tried, under the *Blockburger* test, a later prosecution for the greater offense is barred. *Id.* at 551, 606 A.2d at 249 (Bell, J., dissenting). I, too, decried as unwarranted, the majority's expansion of the *Diaz* exception to cover the situation in which a "reasonable prosecutor" elects to delay prosecution for a greater offense because the "reasonable prosecutor" does not believe that he or she will be able to obtain a conviction. *Id.* at 564–66, 606 A.2d at 256–57. The *Diaz* exception, I believed, applied in the narrow situation in which the greater offense could not have been prosecuted prior to the prosecution of the lesser offense because the facts either did not exist or had not been completed or discovered at that time, despite the exercise of due diligence. *Id.* at 564, 606 A.2d at 256. It was clear from my dissenting opinion that I believed that the *Diaz* exception was not intended to permit the prosecutor to enhance the strength of his or her case; rather, it was intended to ensure that the State had at least one opportunity to prosecute the case. I continue to adhere to those views.

In my dissenting opinion, I neither indulged the majority's assumption concerning the *Grady* exception to the *Blockburger* test,[2] nor adopted Judge Eldridge's conclusion that pre-

---

1. The majority conceded that the Supreme Court has not "announce[d] how the applicability of the *Diaz* exception is to be tested." *Whittlesey v. State*, 326 Md. 502, 525, 606 A.2d 225, 236 (1992).

2. As I noted in my *Whittlesey I* dissent, "[t]he majority has 'assumed for purposes of decision in this case' that the test announced in *Grady*, 495 U.S. at 510, 110 S.Ct. at 2087, 109 L.Ed.2d at 557, namely [that]:

meditated murder did not fall within the *Blockburger* test. The majority, however, has now concluded, as Judge Eldridge previously had done, *see* 340 Md. at 75 & n. 14, 665 A.2d at 245 & n. 14 (1995) that a premeditated murder prosecution is not barred by the prior robbery conviction. Thus, the time has come for me to assess whether the majority's assumption based on the *Grady* exception to the *Blockburger* test is sound or whether Judge Eldridge's analysis is correct. I conclude that the *Whittlesey I* majority's assumption was well-founded, although not for the reason it gave.

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person "shall ... be subject for the same offence to be twice put in jeopardy of life or limb." Federal double jeopardy principles, therefore, are binding in Maryland when determining whether a defendant has been twice placed in jeopardy, *Benton v. Maryland,* 395 U.S. 784, 794, 89 S.Ct. 2056, 2062, 23 L.Ed.2d 707, 716 (1969); *State v. Griffiths,* 338 Md. 485, 489, 659 A.2d 876, 878 (1995); *Newton v. State,* 280 Md. 260, 263, 373 A.2d 262, 264 (1977); *Thomas v. State,* 277 Md. 257, 267 n. 5, 353 A.2d 240, 246 n. 5 (1976); *Jourdan v. State,* 275 Md. 495, 506, 341 A.2d 388, 395 (1975); and *see Middleton v. State,* 318 Md. 749, 756–57, 569 A.2d 1276, 1279 (1990), which makes clear that the Maryland common law of double jeopardy provides similar protection. In addition, the Double Jeopardy Clause proscribes both successive prosecution and multiple punishment for the same offense. *Department of Revenue of Montana v. Kurth Ranch,* —— U.S. ——, —— n. 1, 114 S.Ct. 1937, 1941 n. 1, 128 L.Ed.2d 767, 773 n. 1 (1994); *United States v. Halper,* 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487, 496

---

'the Double Jeopardy Clause bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted,' (footnote omitted)
bars *any* murder prosecution. I make no such assumption." 326 Md. at 555–56 n. 9, 606 A.2d at 251 n. 9.

(1989); *United States v. Wilson,* 420 U.S. 332, 342–43, 95 S.Ct. 1013, 1021, 43 L.Ed.2d 232, 241 (1975); *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656, 664–65 (1969). It is the former prohibition, rather than the latter, which is at issue in this case. The petitioner was charged in 1982 and convicted in 1984 of the robbery of James Rowan Griffin, the victim. When the victim's body was discovered in 1990,[3] the petitioner was indicted for premeditated murder. To avoid trial on that charge, the petitioner filed a motion to dismiss the indictment on the grounds of double jeopardy. Thus, the petitioner's then immediate concern was the avoidance of a successive prosecution.

When confronting the issue of whether the subsequent trial is a successive trial for the same offense, the question to be resolved is whether the offense for which the defendant previously has been tried and convicted and the offense for which it is proposed that he or she subsequently be tried would merge upon conviction, *i.e.,* whether they are deemed the same offense under double jeopardy principles. *Newton,* 280 Md. at 265, 373 A.2d at 265. *See also Bynum v. State,* 277 Md. 703, 707–08, 357 A.2d 339, 341–42, *cert. denied,* 429 U.S. 899, 97 S.Ct. 264, 50 L.Ed.2d 183 (1976).

It is well settled in this State, indeed, it was even conceded by the majority in *Whittlesey I,* 326 Md. at 526, 606 A.2d at 236–37, that felony murder and the underlying felony must be deemed the same offense for double jeopardy purposes. *See Newton,* 280 Md. at 268, 373 A.2d at 266. The rationale underlying that conclusion was discussed in *Newton, supra.* Addressing the required evidence test, the Court explained:

> [U]nder both federal double jeopardy principles and Maryland merger law, the test for determining the identity of

---

**3.** Notwithstanding that the victim's body was not recovered until 1990, there is no doubt that everyone believed the victim to be dead. Indeed, as I pointed out in my dissenting opinion, the robbery case was tried as if the victim were dead. *Whittlesey I,* 326 Md. at 557–60, 606 A.2d at 252–53. Even the trial judge expressed his belief that the victim was dead in passing sentence for the robbery case. *Id.* at 551, 606 A.2d at 249.

offenses is the required evidence test. If each offense requires proof of a fact which the other does not, the offenses are not the same and do not merge. However, if only one offense requires proof of a fact which the other does not, the offenses are deemed the same, and separate sentences for each offense are prohibited.

*Id.* at 268, 373 A.2d at 266. *See Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932). Applying that test, the Court stated:

> Therefore, to secure a conviction for first degree murder under the felony murder doctrine, the State is required to prove the underlying felony and the death occurring in the perpetration of the felony. The felony is an essential ingredient of the murder conviction. The only additional fact necessary to secure the first degree murder conviction, which is not necessary to secure a conviction for the underlying felony, is proof of the death. The evidence required to secure a first degree murder conviction is, absent the proof of death, the same evidence required to establish the underlying felony. Therefore, as only one offense requires proof of a fact which the other does not, under the required evidence test the underlying felony and the murder merge.

*Newton,* 280 Md. at 269, 373 A.2d at 267.

Having been previously convicted of robbery, one of the enumerated felonies in Maryland Code (1957, 1992 Repl.Vol.), Art. 27, § 410,[4] the petitioner subsequently could not have been charged with first degree murder under a felony murder theory. Whether he is nevertheless chargeable with first

---

4. Maryland Code (1957, 1992 Repl.Vol.), Art. 27 § 410 provides:

 All murder which shall be committed in the perpetration of, or attempt to perpetrate, any rape in any degree, sexual offense in the first or second degree, sodomy, mayhem, robbery, carjacking or armed carjacking, burglary in the first, second, or third degree, kidnapping as defined in §§ 337 and 338 of this article, or in the escape or attempt to escape from the Maryland Penitentiary, the house of correction, the Baltimore City Detention Center, or from any jail or penal institution in any of the counties of this State, shall be murder in the first degree.

degree murder under a premeditated murder theory is a matter which must be resolved by reference to the nature of the crime of murder.

Murder is a single offense. *Ross v. State,* 308 Md. 337, 346, 519 A.2d 735, 739 (1987). *See* Art. 27, §§ 407–411 (1957, 1992 Repl.Vol.); *Hook v. State,* 315 Md. 25, 27–28, 553 A.2d 233, 234–35 (1989); *Huffington v. State,* 302 Md. 184, 188, 486 A.2d 200, 202 (1985), *cert. denied,* 478 U.S. 1023, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986); *Gladden v. State,* 273 Md. 383, 389–90, 330 A.2d 176, 180 (1974); *Stansbury v. State,* 218 Md. 255, 260, 146 A.2d 17, 20 (1958). In *Hook,* we pointed out:

> Homicide is the killing of a human being by a human being. It is culpable when it is felonious. It is felonious when it is not legally justifiable or excusable. Felonious homicide is either murder or manslaughter. Murder is in the first degree or in the second degree. In Maryland, all murder perpetrated by means of poison, or lying in wait, or by any kind of wilful, deliberate and premeditated killing or committed in the perpetration of, or attempt to perpetrate certain felonies (of which robbery is one) is murder in the first degree. All other kinds of murder are murder in the second degree.

315 Md. at 27–28, 553 A.2d at 234–35. Article 27, §§ 407–410 provide for and define the types of murder that comprise murder in the first degree. Section 407, for example, provides *inter alia,* that "[a]ll murder which shall be perpetrated ... by any kind of wilful, deliberate and premeditated killing shall be murder in the first degree." Similarly, § 410 provides that murder committed in the perpetration of [certain enumerated felonies] is murder in the first degree. Section 411, on the other hand, provides that all murder not provided for in §§ 407–410 is murder in the second degree.

In *Whittlesey I,* the majority pointed out that the aforementioned statutes do not create new crimes; they only divide the common law crime of murder into degrees for the purpose of punishment, 326 Md. at 520, 606 A.2d at 234 (citing *Bruce v. State,* 317 Md. 642, 645, 566 A.2d 103, 104 (1989)). Converse-

ly, murder and manslaughter, are not degrees of felonious homicide; they are distinct offenses, distinguished by the presence of malice aforethought in murder and the absence of malice aforethought in manslaughter. *State v. Ward,* 284 Md. 189, 195, 396 A.2d 1041, 1045 (1978).

An indictment for first degree murder need not specifically allege the theory under which the State is proceeding.[5] *Ross,* 308 Md. at 344, 519 A.2d at 738. It is sufficient if the indictment charges murder in the first degree. *Id.* *See also* Art. 27 § 616;[6] *State v. Williamson,* 282 Md. 100, 107–08, 382 A.2d 588, 592–93 (1978), *appeal after remand,* 284 Md. 212, 395 A.2d 496 (1979). Moreover, such an apprisal comports with due process requirements. *Ross,* 308 Md. at 345, 519 A.2d at 739. Indeed, it has been held that under a murder indictment, four verdicts can be returned: guilty of murder in the first degree; guilty of murder in the second degree; guilty of manslaughter; not guilty. *Brown v. State,* 44 Md.App. 71, 78 & n. 5, 410 A.2d 17, 22 & n. 5 (1979). *See also Whittlesey I,* 326 Md. at 520, 606 A.2d at 234. In *Ross, supra,* 308 Md. at 346, 519 A.2d at 739, we stated that the State ordinarily must proceed on all available theories in a single prosecution for murder and may not bring seriatim prosecutions for the same offense by alleging separate legal theories. *See Huffington, supra,* 302 Md. at 189 n. 4, 486 A.2d at 203 n. 4 ("In Maryland the homicide of one person ordinarily gives rise to a single homicide offense, and multiple prosecutions or punishments

---

5. The Court in *Ross* stated: "As we have pointed out, murder in the first degree may be proved in more than one way. There is no requirement, however, that a charging document must inform the accused of the specific theory on which the State will rely." 308 Md. at 344, 519 A.2d at 738.

6. Section 616 of Art. 27 provides:

In any indictment for murder or manslaughter, or for being an accessory thereto, it shall not be necessary to set forth the manner or means of death. It shall be sufficient to use a formula substantially to the following effect: "That A.B., on the ..... day of ..... nineteen hundred and ....., at the county aforesaid, feloniously (wilfully and of deliberately premeditated malice aforethought) did kill (and murder) C.D. against the peace, government and dignity of the State".

for different homicide offenses, based on the slaying of one person, are generally precluded.").

I repeat, there is only one crime of murder, which, of course, encompasses first degree murder. To be sure, that offense may be proven in several different ways,[7] but they are simply theories of proof; each theory is not itself a separate offense. Consequently, whatever theory the State might have proceeded on, if successful, the defendant will have been convicted of first degree murder. That defendant may not thereafter be tried for, and convicted of, first degree murder again, even under a different theory. *See Ross,* 308 Md. at 346, 519 A.2d at 739.

Because felony murder is the same offense as the underlying felony, and because, in this case, the underlying felony is robbery, it is clear that when he was tried for robbery, the petitioner was placed in jeopardy not only for the robbery, but for felony murder as well. He was, in other words, placed in jeopardy for first degree murder on a felony murder theory. The State is, therefore, prohibited by the Double Jeopardy Clause of the Fifth Amendment from once again placing him in jeopardy, even using another first degree murder theory.

When there is but one prosecution and trial, the State may proceed on both the felony murder theory and the premeditat-

---

7. An analogous situation is also found in Maryland's Consolidated Theft Offense Statute, Article 27 §§ 340–349 (1957, Repl.Vol.1992), where there is a *"single statutory crime* encompassing various common law theft-type offenses in order to eliminate the confusing and fine-line common law distinctions between particular forms of larceny." *Jones v. State,* 303 Md. 323, 333, 493 A.2d 1062, 1067 (1985) (emphasis added); *see also State v. Burroughs,* 333 Md. 614, 619, 636 A.2d 1009, 1012 (1994).

Ironically, this Court, in *Jones,* recognized the very principle in the theft context it has failed to grasp in the murder context. In that case we said:

As § 342 comprises the single crime of theft, Jones is protected from further prosecution for stealing the property particularized in the indictment. Consequently, the State cannot retry him for another violation of § 342 with regard to the same property. Should the State attempt a second prosecution, Jones could effectively bar retrial by simply producing the indictment and verdict in his first trial.

303 Md. at 341, 493 A.2d at 1071.

ed murder theory. *Frye,* 283 Md. at 717, 393 A.2d at 1376. If the jury finds the murder to have been premeditated as well as committed during the course of a felony, separate punishment may be imposed for both murder in the first degree, under the premeditated murder theory, and the underlying felony. *See id.* at 716, 393 A.2d at 1376; *Newton,* 280 Md. at 269, 373 A.2d at 267. This principle governs because the interest to be vindicated is successive punishment, not successive prosecution. So long as the theory under which the prosecution proceeds and on which it is successful provides a basis for distinguishing the felony and the murder, separate punishments are permissible. It is only when the underlying felony necessarily is the basis for the murder conviction that successive punishments are unwarranted. *Id.* at 269, 373 A.2d at 267.

A different consideration obtains, however, when the issue is successive prosecutions. Simply put, if the act or acts the State seeks to prosecute the defendant for in a successive trial fall within the ambit of that which has been excluded based on the outcome of a prior trial—there can be no subsequent trial.

Indeed, the double jeopardy safeguards against successive prosecutions provide a bulwark against such prosecutorial overreaching. Consequently, the State cannot force a defendant "to defend against the same charge again and again . . . in which the [State] may perfect its presentation with dress rehearsal after dress rehearsal. . . ." *United States v. Dixon,* — U.S. —, —, 113 S.Ct. 2849, 2884, 125 L.Ed.2d 556, 602 (1993) (Souter, J., and Stevens, J., concurring in the judgment and dissenting in part). Thus, as a matter of both law and of pure logic, when there has been a prior conviction for an underlying felony, there necessarily has been a prior prosecution for first degree murder. While the prosecution may desire to proceed later on a different murder theory, it is precluded from doing so.

The cases upon which Judge Eldridge relied for the proposition that a subsequent prosecution for first degree murder on the basis of premeditated murder may be brought notwith-

standing the prior felony conviction are inapposite. In each of those cases there was a single prosecution and the issue to be resolved was whether successive punishment was being imposed for the same offense. There was no issue concerning successive trials for the same offense. *Newton*, 280 Md. at 265, 373 A.2d at 265 ("[i]n the instant case, there has been but one prosecution and trial for the felony murder and the underlying felony so that no issue concerning successive trials for the same offense is presented"); *Robinson v. State*, 249 Md. 200, 238 A.2d 875, *cert. denied*, 393 U.S. 928, 89 S.Ct. 259, 21 L.Ed.2d 265 (1968) (single prosecution); *Swafford v. State*, 498 N.E.2d 1188 (Ind.1986) (same); *Commonwealth v. Harper*, 346 Pa.Super. 105, 499 A.2d 331, 337 (1985), *appeal denied*, 515 Pa. 599, 528 A.2d 955 (1987) (same); *State v. Adams*, 418 N.W.2d 618 (S.D.1988) (same); *Simpson v. Commonwealth*, 221 Va. 109, 267 S.E.2d 134 (1980) (same); *Williams v. Smith*, 888 F.2d 28 (5th Cir.1989) (same). Moreover, in *Simpson* the court pointed out the significance of the indictment, as I have done, and the fact that it need not specify the theory upon which the State is proceeding.[8] *Id.* 267 S.E.2d at 138–39.[9]

---

**8.** The *Simpson* court stated: "While the indictment must describe to the defendant the offense charged against him, Code § 19.2–220, provides that in executing this function the indictment may 'state so much of the common law or statutory definition of the offense as is sufficient to advise what offense is charged.'" 267 S.E.2d at 138.

**9.** The majority, in an effort to justify its adoption of Judge Eldridge's position in *Whittlesey I* that a premeditated murder prosecution is not barred by the petitioner's prior robbery conviction, points to *Bowers v. State*, 298 Md. 115, 468 A.2d 101 (1983), *cert. denied* 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986), as did Judge Eldridge, as proof that "the double jeopardy prohibition does not bar the prosecution of a defendant for an intentional homicide, even though the defendant was earlier prosecuted and convicted for robbing, raping, or kidnapping the same victim." 340 Md. at 75 n. 15, 665 A.2d at 245 n. 15 (1995) (quoting *Whittlesey I*, 326 Md. at 538, 606 A.2d at 242) (Eldridge, J., concurring and dissenting).

The majority's attempt is unavailing. *Bowers* is not persuasive in the successive prosecution context. It relies upon *State v. Frye*, 283 Md. 709, 393 A.2d 1372 (1978), which, as we have already demonstrated, deals with the cumulative punishment strand of the Double Jeopardy Clause. Clearly, therefore, *Bowers* is no stronger authority than the foundation on which it is built. Ultimately, however, what is more

Although *United States v. Dixon*, which sounded the death knell of *Grady v. Corbin*[10] and which was decided after *Whittlesey I*, is a successive prosecution case, it is distinguishable from the instant case. Whereas in this case, applying the required evidence test, the defendant clearly had been previously placed in jeopardy for first degree murder, *via* the robbery prosecution, therefore precluding the State from seeking another murder prosecution, the critical question to be resolved in *Dixon* was whether the defendants,[11] in fact, previously had been prosecuted for the offenses for which they were subsequently indicted. Specifically, the double jeopardy issue in *Dixon* was "whether prosecution for criminal contempt based on violation of a criminal law incorporated into a court order bars a subsequent prosecution for the criminal offense." —— U.S. at ——, 113 S.Ct. at 2855, 125 L.Ed.2d at 567. Indeed, Justice Scalia, writing for the Court, noted that this issue represented a recent development in American case law. *Id.*

Because he previously had been placed in jeopardy for first degree murder, via his robbery prosecution and conviction, and the extension of the *Diaz* exception was unwarranted, *see Whittlesey I*, 326 Md. at 555–56, 606 A.2d at 251–52 (Bell, J., dissenting), the petitioner should never have been tried for

---

troubling is the majority's continued muddying of the distinction between successive punishment cases and successive prosecution cases in the context of double jeopardy jurisprudence. That distinction is not, nor was it meant to be, a slight one. Indeed, for the petitioner, it has caused his life to hang in the balance.

**10.** The Court, in *Dixon*, concluded that *Grady* had to be overruled because it proved to be unworkable, adding little to the Court's double jeopardy jurisprudence. —— U.S. ——, ——, 113 S.Ct. 2849, 2864, 125 L.Ed.2d 556, 577–78 (1993).

**11.** *Dixon* involved two separate defendants. Both defendants, Dixon and Foster, had been found guilty of criminal contempt and were subsequently indicted for substantive crimes arising out of the same conduct involved in the contempt proceedings. —— U.S. at —— – ——, 113 S.Ct. at 2853–54, 125 L.Ed.2d at 565–66. Dixon and Foster raised double jeopardy claims. The cases were consolidated by the District of Columbia Court of Appeals. *Id.* at ——, 113 S.Ct. at 2854, 125 L.Ed.2d at 566.

first degree murder on *any* theory. Accordingly, I would reverse the judgment, and dismiss the charges, with prejudice.

## II.

I agree with the petitioner that the trial court erred in permitting the State to exercise a peremptory challenge to strike a black woman from the *venire* because of her race. *See Batson,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Contrary to the State's and the majority's position, it is at best unclear whether the trial court ruled that the petitioner failed to establish, as *Batson* requires, a *prima facie* case of purposeful and racially discriminatory use of challenges by the State, although it is perfectly clear that it did not effectively do so.

## A.

The Supreme Court, in *Batson,* departed from the standard articulated in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), and held:

> [A] defendant may establish a prima facie case of purposeful discrimination in [the] selection of the petit jury [based] solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial.

*Batson,* 476 U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87. To establish such a case, the defendant must show that the prosecutor exercised peremptory challenges to remove from the *venire* members of a cognizable racial or ethnic group, whether or not the defendant is a member of that racial or ethnic group. *See Gorman v. State,* 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991); *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Mejia v. State,* 328 Md. 522, 529, n. 3, 616 A.2d 356, 358–359 n. 3 (1992).

As this Court noted in *Stanley v. State,* 313 Md. 50, 59, 542 A.2d 1267, 1271 (1988), establishing a *prima facie* case is but the first step of the three step process prescribed by *Batson* for determining whether the State's use of peremptory challenges is constitutionally permissible. The other two steps

involve requiring the State to offer a neutral explanation for its strikes once a *prima facie* case of racial discrimination has been made out, *id.* at 61, 542 A.2d at 1272, and the trial court's ultimate determination whether the defendant has proven purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395, 402 (1991) (plurality opinion, Kennedy, J.); *Mejia*, 328 Md. at 533, 616 A.2d at 361; *Stanley*, 313 Md. at 61, 542 A.2d at 1272.

Once the defendant has established a *prima facie* case, "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. Although the State's explanation need not meet the standard for justifying the exercise of a challenge for cause, the prosecutor is required to give a clear and reasonably specific explanation, constituting legitimate reasons for exercising the challenges, *Stanley*, 313 Md. at 78, 542 A.2d at 1280 (quoting *Batson*, 476 at 98 n. 20, 106 S.Ct. at 1723 n. 20, 90 L.Ed.2d at 88 n. 20), and the explanation must be sufficient to establish that the exclusion does not constitute purposeful and racially discriminatory exclusion of *venirepersons*. *McCray v. Abrams*, 750 F.2d 1113, 1132 (2nd Cir.1984); *Booker v. Jabe*, 775 F.2d 762, 773 (6th Cir.1985).

Finally, the trial court is required to undertake "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available" to determine whether the defendant has satisfied his or her ultimate burden of persuasion. *Batson*, 476 U.S. at 93, 106 S.Ct. at 1721, 90 L.Ed.2d at 85 (quoting *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). In *Batson* the Court pointed to the existence of a pattern of strikes against black jurors included in the particular *venire* and statements made by the prosecutor, in exercising his challenges, as illustrative of the types of considerations upon which a court may properly base that determination. *See also Hernandez*, 500 U.S. at 359, 111 S.Ct. at 1866, 114 L.Ed.2d at 402 (plurality opinion, Kennedy, J.); *Mejia*, 328 Md. at 533,

616 A.2d at 361 (quoting *Stanley,* 313 Md. at 60–61, 542 A.2d at 1272).

### B.

In establishing a prima facie case,

> [t]he defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the impaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

*Batson,* 476 U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87–88 (quoting *Avery v. Georgia,* 345 U.S. 559, 562, 73 S.Ct. 891, 892, 97 L.Ed. 1244, 1247–1248 (1953)) (citations omitted). Moreover, in *Stanley,* we opined,

> the prima facie showing threshold is not an extremely high one—not an onerous burden to establish.... It simply requires the defendant to prove by a preponderance of the evidence that the peremptory challenges were exercised in a way that shifts the burden of production to the State and requires it to respond to the rebuttable presumption of purposeful discrimination that arises under certain circumstances.

*Id.* 313 Md. at 71, 542 A.2d at 1277, citing *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 215 (1981).

We made clear in *Stanley* that the trial court may not merely state a conclusion that the defendant has failed to make out a *prima facie* case; it must make specific findings in that regard. *Id.* at 71, 542 A.2d at 1277. In that case, we held that the trial court had not made the necessary finding. *Id.* at 70, 542 A.2d at 1277. We noted, in that regard, that the

trial court "did not enumerate the *Batson* criteria, what matters [it] had observed during jury selection, were there apparent reasons (based on those observations) for striking certain blacks on nonracial grounds, and the like?" *Id.* In a footnote, we observed:

> We emphasize here the need for the record to contain not only specific findings by the judge, but also information to support those findings; information such as the numbers of blacks and whites on the venire, the numbers of each stricken for various reasons, the reasons underlying strikes for cause, pertinent characteristics of jurors excluded and retained, relevant information about the race of the defendant, the defendant, the victim, and potential witnesses, and so forth.

*Id.* n. 11. The relevant circumstances that "might give rise to or support or refute" the *prima facie case* finding, include "a 'pattern' of strikes against ... jurors [of the cognizable group] in the particular venire, or the prosecutor's questions and statements during the voir dire examination in the exercise of peremptory challenges...." *Id.* at 60, 542 A.2d at 1272. Again, we announced in *Stanley* that "the prima facie showing threshold is not an extremely high one—not an onerous burden to establish." *Id.* at 71, 542 A.2d at 1277, citing *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094, 67 L.Ed.2d at 215. Furthermore, although it is the defendant's burden to establish a *prima facie* case, "[w]hether the prerequisite *prima facie* showing has been made is the trial judge's call, ... which must be made in light of all of the relevant circumstances." *Mejia,* 328 Md. at 533, 616 A.2d at 361, citing *Stanley,* 313 Md. at 60, 542 A.2d at 1272 (quoting *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88).

## C.

With these principles in mind we consider the colloquy which gave rise to the issue *sub judice:*

[APPELLANT'S COUNSEL]: Your Honor, we would be objecting to the State challenging Ms. Wright at this time. I would note that they previously exercised one of the

peremptory challenges to strike Ms. Brummell, who's an African–American. Ms. Wright is an African–American. The State uses its second strike to strike her ... (inaudible) ... There are four (4) remaining African–Americans remaining in the panel today. I think the State has raised a prima facie case ... (inaudible) ... using its peremptory challenges ... (unintelligible.)

THE COURT: Wouldn't he have to be a member of the same class, white male?

[APPELLANT'S COUNSEL]: No Your Honor. The Supreme Court has decided that ... (unintelligible) ... in favor of the defendants.

THE COURT: Okay, I also noticed that all the State's strikes are female. Where does that leave me with regards to future challenges whether they be African–American or not?

[APPELLANT'S COUNSEL]: Again Your Honor, I would raise the same objection as ... (inaudible.)

THE COURT: I'm thinking a larger class though. That means that they have to come up here and explain every female challenge. If he's not a member of the that female, he's not a member of any identifiable group, they've got to explain. I'm not clear, I'm not playing with you but I'm not sure what I've got to get them to defend. Anyway, you know the rules and you can put on the record whatever you want as to any or all of the challenges that you've exercised so far.

[PROSECUTOR]: Well of course Your Honor, I would ask for a decision with regard to question of whether we have, by our strikes, placed ourselves in position with the Court, is going to require that some showing be made that we are not striking jurors for what could be race control (sic) reasons.

THE COURT: Okay, I'm not going to require you to but I think, because we never know what's going to happen from Monday to Monday in Washington, it wouldn't hurt if there is a reason that has nothing to do with race or sex,

that you put it on there, but I'm not going to require you to do that and I don't think that I have to.

[PROSECUTOR]: The question is ... I think I understand your ruling but, it's as if you are allowing us to make an explanation but you're not binding, my ... our question is, have you found as a matter of fact that there is a condition to using your strikes for reasons other than the special reasons is the crux of the initial inquiry that would need to be made?

THE COURT: Well as I say, I didn't state it but my question is, why should I conclude that they, the State is using the strikes only against black females when the statistical evidence is that they've used them against females and therefore, that is why I said, I've got to know what I'm asking the State to justify and if I'm asking them, I'm discriminating if I only ask they to justify their excuses ... their peremptory challenges to black females. If I'm going to do something like this I guess I really have to ask them for anything ... white males, which ironically is the one group he could identify with.

[APPELLANT'S COUNSEL]: Your Honor, I disagree. I think there is an addition that there is a ... (unintelligible).

THE COURT: You have to talk about an identifiable group first. You have selected African–American females. I'm saying ...

[APPELLANT'S COUNSEL]: We have not selected African–American females.

THE COURT: (Unintelligible)

[APPELLANT'S COUNSEL]: ... (Unintelligible) ... African–Americans, there is a difference.

THE COURT: Well ...

[APPELLANT'S COUNSEL]: We include the female ... (inaudible).

THE COURT: Well that's because that's what he said when he came up here. He said that I want to call the Court's attention to the fact that there ... two of the

State's strikes have been black females and then he looked around the courtroom and came up with four or something, I don't really know who he's looking at . . .

[APPELLANT'S COUNSEL]: We mean African–American, not African–American females.

THE COURT: Okay, well, you've cut the cloth out, I don't care how you cut it out, but if that's your criteria . . .

[APPELLANT'S COUNSEL]: Yeah, that is our criteria, African–Americans Your Honor, under the . . . (inaudible) . . . and I think you know, the reason that I pointed out other people in the courtroom, is that to preserve an issue like this, the Courts say that I'm required to give . . . to make the record as to the racial composition of the panel and ah, I think I have at this point. We have a situation here Your Honor, there is a very small number of African–Americans contained in this panel and the State has used two (2) of it's four (4) peremptory challenges thus far to strike African–Americans and I think that raises a prima facie case using an impermissible pattern as to . . . (inaudible).

THE COURT: Well, I don't find any racial issue that the State has to explain at all, but if you want, under *Batson* or something, theory of law that hasn't been decided yet.

[PROSECUTOR]: With that invitation from the Court, I will put the following comments on the record. First I would note that the State has used only four (4) challenges at this point and that two (2) were directed against African–Americans and two (2) were not. At this point, the Defense has used eleven (11) challenges or strikes. With regard to Ms. Brummell I will . . . who was juror number 3, I will put on the record that during death qualification she indicated that she does not want someone's fate in her hand. When she approached the box this morning and was advised that she was acceptable by both parties, she rolled her eyes and said "Oh no," and then took her seat, clearing indicating that she doesn't want to be on this jury.

With regard to Ms. Wright, the basis for our striking her has nothing to do with her sex or her race, but rather her employment. Umm, that's all I have on her.

[APPELLANT'S COUNSEL]: Your Honor, with regard to Ms. Brummell, the State says that they only struck her because she seemed reluctant to serve, well then my question to her was why didn't they strike Ms. Ross if that was the reason, since she was up here and explained to the Court time and time again that she doesn't want to serve.

THE COURT: You beat her to it.

[APPELLANT'S COUNSEL]: No we didn't.

[PROSECUTOR]: Yes you did.

[APPELLANT'S COUNSEL]: Yes we did.

THE COURT: (Inaudible.)

[APPELLANT'S COUNSEL]: With regards to Ms. Wright Your Honor, the State has said employment and I would ask the Court to direct an inquiry as to what employment she is in that the State finds so objectionable and to as whether any other people that they did find acceptable has similar ...

THE COURT: Okay, well I entirely agree with Judge Moreland in ... (unintelligible) ... You just never end and after a while, they're not peremptory challenges but they are his judicially approved challenges. In other words, if I think the reasons are good enough that somebody uses, or tells me they did something for, then it's okay, it's not racially discriminatory or sexually discriminatory, and I, I don't find the law or the facts in this situation. If we ... let me give you a (unintelligible) situation. If the State packed this jury with nothing but females, particularly if they were white females let's say and I was in the totally opposite group, as your client is, then maybe there maybe ought to be law that would require them to explain that but we haven't even come close to that happening and it's practically impossible since ... in fact our ... (unintelligible) ... shows, are more women than men on our jury panels because they register to vote and they live longer. I can't

do anything about either of those things. Anyhow ... (inaudible) ...

[APPELLANT'S COUNSEL]:

THE COURT: Okay, as the auctioneer says, going once, going twice. You want a minute? The jury is satisfactory? Main panel and alternates to both sides?

[PROSECUTOR]: They are to the State, Your Honor.

[APPELLANT'S COUNSEL]: With the exception of the objections already noted, Your Honor.

THE COURT: That's noted.

The majority asserts that the trial court concluded that the appellant did not make out a *prima facie* case of race discrimination, but nevertheless permitted the State to provide race neutral reasons for its peremptory strikes. By stating that "[a]lthough it would have been preferable for the trial judge to state the reasons for his rulings expressly," the majority recognized that the trial court did not state its reasons for the ruling, as *Stanley* requires. The majority then presumes that the trial court knew the law and properly applied it. 340 Md. at 48, 665 A.2d at 232. *See also Beales v. State*, 329 Md. 263, 273, 619 A.2d 105, 110 (1993). I cannot agree.

First of all, it is far from clear that the trial court knew the law and properly applied it. Logically, that presumption can apply only if the record does not negate it; if the record reflects that the court did not know the law or did not properly apply it, the presumption may not be indulged. *Quinn v. Quinn*, 83 Md.App. 460, 466–467, 575 A.2d 764, 767 (1989); *Campolattaro v. Campolattaro*, 66 Md.App. 68, 80–81, 502 A.2d 1068, 1074–1075 (1986). In this case, the trial court made statements indicating that it did not know the law. The trial court, in 1994, apparently was unaware that it was no longer a requirement of the *Batson* rule that the excluded juror be a member of the same cognizable group as the defendant, an issue resolved by the Supreme Court as early as 1992, *see Gorman*, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (holding that a white defendant had standing to challenge,

under *Batson,* the strike of black venirepersons); *Powers,* 499 U.S. at 416, 111 S.Ct. at 1373, 113 L.Ed.2d at 429 (same), and acknowledged by this Court in 1991, *see State v. Gorman,* 324 Md. 124, 596 A.2d 629 (1991). *See also Mejia,* 328 Md. at 529 n. 3, 616 A.2d at 358–359 n. 3. Thus, in this case, the record clearly contains information that would suggest that the trial court did not know the law. From this information, it can be concluded that it did not properly apply the law. Moreover, the trial court's discussion of the *Batson* issue, particularly its focus throughout the colloquy, on gender and race, even after the petitioner made clear that race, and not gender, was the basis of his objection provides another reason for not applying the presumption.

Nor is it even clear that the trial court ruled that the petitioner had not made out a *prima facie* case. The circumstances of this case are akin to those in *Stanley.* There, after defense counsel had argued that the defendant was entitled to have the State explain the basis for its strikes and after a dispute arose as to the race of one of the jurors, the trial court asserted:

You see the problem is Ms. Lewis may well have been black. The problem is we in Prince George's County gave up keeping track of people's color 17 years ago. We don't keep a record of people's race. The computer doesn't have the racial designation on it when it selects people.

Somebody will be in trouble if this issue is appealed trying to figure out what color this list was because by law we may not keep racial designation. So the Supreme Court in its efforts in the *Batson* case has really put the rest of the world in trouble. They had been telling us 30 years don't make any decisions predicated upon race, creed, color, religious, national origin, and Article 46 says sex. So we stopped doing all of that. The next thing they want to know is what color is everybody. You can't have it both ways.

I will tell you at this point I am the lowly trial judge, and I'm at a loss as to what to do except to tell you, [defense counsel] I perceive no more indication of striking blacks on the part of the State than I do on your part. I notice that

your very first strike, second strike—now, your very first strike was Mr. Ronald Dendy. Then it was Mrs. Shirley Thomas. You can go on through like that.

I don't perceive it as trying to find out who is more white or black. God forbid we go back to those days.

I just see no racially motivated evidence of—evidence of racially motivated exercise of the strikes in this court. I deny your motion.

Maybe at some later date someone will tell me how to do it. They will have [a] real problem, a real problem. I am not sure about the rest of Maryland, but they have a real problem in Prince George's County because we haven't kept racial designation since 1969. I guess next we will go back to seeing the name in the newspaper, John Smith, colored.

That ruling is completed. Gentlemen.

*Stanley*, 313 Md. at 67–68, 542 A.2d at 1276.

This Court observed, "[i]t is impossible to tell from these remarks whether the judge was attempting to make a *Batson prima facie* case ruling or whether he was philosophizing in a general way about racial matters . . .," *Stanley*, 313 Md. at 70, 542 A.2d at 1277; it was not at all clear that the trial court had ruled that there was a lack of a *prima facie* case. Similarly, in the instant case, it is possible that the trial court was "philosophizing" as to whether black women should be classified primarily according to their race of their gender, or that it was attempting to make a reasoned determination regarding the petitioner's attempt to make out a *Batson prima facie* case. Whatever its intent, as in *Stanley,* the trial court "did not enumerate the *Batson* criteria or articulate any specific bases for finding lack of a prima facie showing." *Id.*

### D.

I am not at all convinced that the petitioner failed to make out a *prima facie* case. The threshold which must be met is not an exacting one, and the *prima facie* case determination must take into account all of the relevant facts and circumstances, including the fact that peremptory challenges may be

used discriminatorily by those who are of a mind to discriminate. *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87–88 (quoting *Avery,* 345 U.S. at 562, 73 S.Ct. at 892, 97 L.Ed. at 1247–1248).

When challenged, the State had used four peremptory challenges, two of which were used to exclude blacks from the panel. This fact takes on greater significance when considered in light of the additional fact that only six of the fifty-five *venirepersons* remaining after *voir dire* were black. Although one may argue that it would have been better had the petitioner's objection come after the State had exercised all of its peremptory challenges, the use of two of four challenges to exclude black *venirepersons,* comprising less than twelve percent of the entire *venire,* I believe, is sufficient to establish a *prima facie* case. Stated differently, while it may have been a clearer case, one way or the other, had the *Batson* challenge come later in the process, after it was clear what had happened to the other four blacks, that is not required. A party is not required to wait until all of the other party's peremptory strikes have been exercised before objecting. Indeed, the striking of a single black juror for racial reasons constitutes a violation of the equal protection clause, *Stanley,* 313 Md. at 88, 542 A.2d at 1286 (quoting *U.S. v. Battle,* 836 F.2d 1084, 1086 (8th Cir.1987)), and "any doubt as to whether the complaining party has met its initial burden should be resolved in that party's favor." *State v. Slappy,* 522 So.2d 18, 20 (Fla.1988). *See Stanley,* 313 Md. at 69–70, 542 A.2d at 1276. Essentially, the objecting party is only required to produce evidence sufficient to necessitate a response from the other party. Clearly, in the instant case, this requirement has been satisfied.

### III.

The petitioner does not contend that the tape of the victim playing the piano was "unduly inflammatory," the limitation placed on the admission of victim impact evidence. *Evans v. State,* 333 Md. 660, 688, 637 A.2d 117, 131 (1994). He argues, instead that, given the victim's mother's testimony, the evi-

dence was cumulative. The majority holds that the videotape provided the jury with relevant information not already in evidence, such as the victim's skill as a pianist and his appearance at the time of death, which could not be captured by a still photograph. 340 Md. at 86, 665 A.2d at 250. I disagree.

It is now a well established principle of law that the introduction of victim impact evidence is constitutionally permissible, *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *Evans,* 333 Md. at 684–685, 637 A.2d at 129, and includes any evidence which the court deems probative and relevant to sentencing. *Lodowski v. State,* 302 Md. 691, 738–739, 490 A.2d 1228, 1252 (1985), *vacated on other grounds,* 475 U.S. 1078, 106 S.Ct. 1452, 89 L.Ed.2d 711 (1986). Nevertheless, such evidence is dangerous because of its tendency to act as a super-aggravating factor. I believe, therefore, that great care must be taken to insure that such evidence does not have that effect; it should not be characterized, or be used in such a way as to trump any mitigating circumstance proven by the appellant. It ought not, in other words, be the decisive factor in determining an accused's fate. *Evans,* 333 Md. at 713–714, 637 A.2d at 143 (Bell, J. dissenting).

The purpose of victim impact evidence is to show the uniqueness of the victim and the impact of the offense on family members. *Id.* (quoting *Payne,* 501 U.S. at 822, 111 S.Ct. at 2607, 115 L.Ed.2d at 734).

> The determination whether the admission of victim impact evidence in a capital sentencing procedure offends due process involves an analysis of whether its introduction will cause the proceedings to be fundamentally unfair ... [which], in turn, involves a consideration of the impact of that evidence on the exercise of discretion by the trier of fact.... Whether the fact finder's discretion is suitably directed and limited necessarily must depend upon the purpose for which the evidence is offered and its relevance to the issue to be decided, that is, whether it is admitted for a legitimate purpose and it actually performs that purpose.

*Evans,* 333 Md. at 713, 637 A.2d at 143. The videotape of the victim playing the piano is not relevant to show the impact that Mr. Griffin's death has had on his family members; statements made by his mother, were sufficient to establish both his unique abilities and the impact of his murder on his family. The only effect of the videotape, I believe, was to show the impact of the victim's death on society at large, to show that because of his special talents and abilities, society has suffered a greater loss than it would have, had the victim not been a nationally renowned pianist.

Society suffers a loss whenever any one of its citizens is murdered, regardless of his or her accomplishments, talents or abilities. Although the death of certain citizens may be more publicized, we must not view their worth and the detriment to society resulting from their deaths, to be more or less than for any other citizen. The victim impact evidence in this case suggests that it is appropriate for society to place a higher premium on some lives than on others. Its admission is an open invitation to the jury to so view the victim in this case and to act accordingly in determining the petitioner's fate.